2025 IL App (4th) 220887

NO. 4-22-0887

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Livingston County |
| RAYMOND A. MAURY III, | ) | No. 18CF162 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Jennifer Hartmann Bauknecht, |
| | ) | Judge Presiding |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Presiding Justice Harris and Justice Cavanagh concurred in the judgment and opinion.

**OPINION**

¶ 1        In June 2018, following a traffic stop, defendant, Raymond A. Maury III, was charged with (1) unlawful possession with intent to deliver a controlled substance (cocaine), a Class X felony (720 ILCS 570/401(a)(2)(C) (West 2018)) and (2) possession of heroin, a Class 4 felony (*id.* § 402(c)). Defendant, *pro se* and through counsel, filed several motions to suppress the evidence obtained from the traffic stop, which the trial court denied.

¶ 2        In May 2022, a jury found defendant guilty of unlawful possession with the intent to deliver cocaine.

¶ 3        In July 2022, the trial court conducted an inquiry pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), into defendant's *pro se* claims of ineffective assistance of counsel and declined to appoint defendant new counsel. The court then denied defendant's posttrial motion and

sentenced defendant to 35 years in prison.

¶ 4 In July 2022, defendant appealed, arguing, among other things, that the trial court erred by failing to appoint new counsel to investigate and present his claims of ineffective assistance. In June 2023, this court remanded this case for the appointment of *Krankel* counsel and further proceedings on defendant's claims of ineffective assistance of counsel, holding that defense counsel filed an "untimely third motion to suppress and did not refer to any expert in the proposed third motion to suppress." *People v. Maury*, No. 4-22-0887 (2023) (unpublished summary order under Illinois Supreme Court Rule 23(c)). This court did not consider the merits of defendant's other claims on appeal. *Id.*

¶ 5 On remand, the trial court appointed new counsel who filed a "Motion to Vacate Conviction and Appoint Effective Counsel." In May 2024, the court conducted a hearing on that motion and denied it in a written order.

¶ 6 Defendant appeals, arguing (1) the trial court erred by (a) denying his motion to suppress evidence obtained from an improper traffic stop, (b) sustaining numerous State objections and limiting defense counsel's ability to challenge the validity of the traffic stop, (c) denying defendant's request to proceed *pro se* following trial, and (d) considering a factor inherent in the offense of possession with intent to deliver during sentencing and (2) *Krankel* counsel provided ineffective assistance by failing to adequately present defendant's claims of ineffective assistance of defense counsel. We disagree and affirm.

¶ 7 I. BACKGROUND

¶ 8 A. The Charges

¶ 9 In June 2018, following a traffic stop, the State charged defendant with (1) possession with intent to deliver more than 400 grams of a substance containing cocaine, a

Class X felony (720 ILCS 570/401(a)(2)(C) (West 2018)) and (2) possession of heroin, a Class 4 felony (*id.* § 402(c)). At defendant's request, the trial court appointed the public defender to represent him.

¶ 10                              B. Pretrial Motions and Proceedings

¶ 11          In September 2018, defendant waived his right to counsel and chose to proceed *pro se*. From that time through February 2021, defendant requested and was granted multiple continuances to obtain pretrial discovery and to prepare pretrial motions.

¶ 12          In August 2019, defendant *pro se* filed a motion to suppress evidence, arguing that the traffic stop was impermissibly prolonged to conduct a free-air dog sniff. In February 2021, when the trial court conducted a hearing on that motion, defendant requested that the public defender be appointed a second time. The court granted that request and continued the hearing.

¶ 13          In April 2021, defense counsel filed a new motion to suppress, arguing that (1) the police lacked a reasonable basis to stop defendant's vehicle and (2) the stop was unreasonably prolonged to conduct the free-air sniff.

¶ 14          In May 2021, Gary Morris, a private attorney, filed his appearance on defendant's behalf, and the trial court vacated the public defender's appointment. In July 2021, Morris (1) adopted the motion to suppress filed by the public defender and (2) filed a supplemental motion to suppress that expanded on the claim that law enforcement officers unreasonably prolonged the traffic stop.

¶ 15                              C. The Motion To Suppress Hearing

¶ 16          Over three days—March 3, April 8, and April 22, 2022—the trial court conducted a hearing on both the defendant's motion to suppress evidence and supplemental motion. The following evidence was presented.

¶ 17                              1. *Michael Heffner-Dewitt*

¶ 18        Illinois State Police Trooper Michael Heffner-Dewitt testified that on June 1, 2018, he was assigned with five or six other state troopers to a construction zone project that was ongoing on Interstate 55 (I-55). He was parked in the median of I-55 and had a dashboard camera that was pointed at southbound traffic. He explained that whenever he activated the "toggle for the [police car's] lights" a video camera began saving the footage that was recorded one minute before the car's lights were activated.

¶ 19        Around 1 p.m., Heffner-Dewitt saw defendant commit the traffic infraction of following too closely to a semitruck, and Heffner-Dewitt conducted a traffic stop. He spoke to defendant on the side of the road and asked him to sit in his police car, explaining that defendant was not under arrest but that Heffner-Dewitt "just want[ed] to write [defendant] a warning, check [his] license and get [him] on the road." Heffner-Dewitt said that this was normal procedure for his traffic stops for officer safety, efficiency, and also for providing time for the motorist to gather documents he or she needs while he types out the warning or ticket. He denied that this was intended to "stall the stop." Once defendant was in Heffner-Dewitt's squad car, he made conversation with defendant while he typed up a warning ticket. At that time, because he felt that defendant was acting suspiciously, he messaged Sergeant Steven Ent for backup.

¶ 20        When Ent arrived, he had his canine with him. Heffner-Dewitt did not remember how long it took for Ent to get to his location. Upon seeing Ent, defendant exited Heffner-Dewitt's car and attempted to run toward his car. Heffner-Dewitt gave chase, subdued defendant next to the door of defendant's car, and placed him under arrest. Following the arrest, Ent conducted an open-air dog sniff of defendant's car.

¶ 21        Morris asked Heffner-Dewitt whether he had reviewed the dashcam footage of the

stop, and Heffner-Dewitt replied affirmatively. Morris then showed Heffner-Dewitt a document, which Heffner-Dewitt described as an "arrest synopsis for jail" that he had prepared following defendant's arrest. He acknowledged that it included a section entitled "probable cause statement." Morris noted that the document incorrectly memorialized that the stop occurred at "milepost marker 96." Heffner-Dewitt explained that he should have written "197 and a half." Morris asked whether the document contained any other errors that should be corrected. The State objected and asserted that the document was hearsay.

¶ 22         The trial court sustained the objection, stating as follows:

              "Yeah. The document itself is hearsay. If, so just for him to—I mean, it's a
              vague question. I don't even quite know the relevance of that question, so I am
              going to sustain the objection to the question. I'm not saying you can't refer to the
              document, but I don't understand what you mean by any other changes to the
              document. It's a hearsay document."

¶ 23         Heffner-Dewitt testified that he previously viewed the video of the traffic stop and the infraction that was on that video, but he noted it had "been a while" since he had viewed it. Heffner-Dewitt could not remember how soon after the start of the video defendant committed the traffic infraction.

¶ 24         Morris asked Heffner-Dewitt whether he told defendant that he "was traveling too close to the semi when he passed [Heffner-Dewitt] on the median." Heffner-Dewitt initially said that he would need to watch the video of the stop again and asked whether counsel was referring to a transcript of his interaction with defendant. Morris said that he did have a transcript of the video, and at that point, Heffner-Dewitt agreed that he told defendant, "[W]hen you passed me there on the median and when I came up to you[,] you were maybe a car length behind the semi."

¶ 25        Morris attempted to show the transcript to Heffner-Dewitt and the State objected, in part, because it believed the transcript was hearsay. The trial court sustained the State's objection, finding that there was no foundation for the document and that it was hearsay.

¶ 26        Morris played a portion of the video recorded by Heffner-Dewitt's dashcam. In the video, Heffner-Dewitt told defendant that the traffic stop was necessary because defendant was following the semi too closely. Heffner-Dewitt added, "When you passed me there in the median, and then I came up on ya, you were maybe a car length behind that semi."

¶ 27        Heffner-Dewitt was not able to explain or describe the distance between defendant's car and the semitruck during the hearing on the motion to suppress, but he offered an opinion that defendant was "too close." He explained that the relevant statute required cars to maintain a reasonable distance from each other and, in his opinion, a reasonable distance would be five to six car lengths, depending on a vehicle's speed. Heffner-Dewitt testified that he believed that defendant was following the semi too closely "at the time when I observed him." Morris asked the trial court if he could play the dashcam video for Heffner-Dewitt, but the court denied the request, stating that the video had already been played and "speaks for itself."

¶ 28                                    2. *Steven Ent*

¶ 29        Ent testified that Heffner-Dewitt requested that Ent and his canine respond to the scene of the traffic stop. He arrived at Heffner-Dewitt's location "less than ten minutes from the time that [Heffner-Dewitt] made the stop." Ent testified that his canine was originally trained by another police department to be an aggressive alert dog, which meant that the dog would scratch or paw when he believed contraband was present. Ent explained, "We retrained him as a passive alert dog which would mean he would sit, lay down or stand and stare." Morris played a video of the canine's alert, and Ent acknowledged that the canine attempted to jump through defendant's

car's window. Counsel asked whether the canine's response was a passive or aggressive response, and Ent explained that the dog was just trying to "get to the source of the odor."

¶ 30                                    3. *Troy Hart*

¶ 31        Troy Hart testified that he was a civil engineer for the Illinois Department of Transportation (IDOT) and had been overseeing a road construction project on I-55 from milepost 194 to 205. He testified that the final center line pavement marking on that stretch of road was a "ten foot stripe and a 30 foot gap." Morris asked Hart whether he was familiar with the striping around mile markers 196 and 197 going southbound on I-55 from Chicago to St. Louis on June 1, 2018. Hart answered, "That was outside of my construction limits during that timeframe." Hart testified that the area was nearby and that he would travel to that area of I-55 daily in 2018.

¶ 32        On cross-examination, the State asked Hart whether he was "able to testify to pavement striping dimensions on that specific mile marker of the I-55 project for June 2018." Hart said, "No."

¶ 33                                    4. *Bill Kocher*

¶ 34        Bill Kocher testified that he owned Multimedia Services, a business that specialized in video and audio production. The defense retained him to view videos and illustrate the distance and number of car lengths between vehicles as they were passing an interstate median. Kocher also prepared various demonstrative exhibits.

¶ 35        The State objected, questioning whether Kocher was qualified to testify about the distances between vehicles recorded by Heffner-Dewitt's in-car cameras. The trial court sustained the State's objection to foundation but told the defense that, as long as Kocher explained what he did to create the demonstrative exhibits, it "[did not] have a problem viewing the demonstrative exhibits for what they are, which [are] demonstrative exhibits to help [aid] the Court."

¶ 36　　　　Kocher testified that he reviewed three videos, a wide-angle video that showed the entire highway, a dash cam video that recorded the front of Heffner-Dewitt's police car, and a video of the interior of Heffner-Dewitt's car. Kocher placed all three videos on a single screen and synchronized them, so they were "perfectly in time with each other."

¶ 37　　　　Morris played the first 26 minutes of an exhibit prepared by Kocher, showing all three videos on the same screen. The trial court also allowed a second video exhibit to be played as a demonstrative exhibit. That video, which was edited by Kocher, illustrated the number of car lengths between vehicles as they passed Heffner-Dewitt's position in the interstate median. In that video, Kocher attempted to demonstrate that there were at least nine car lengths between defendant's car and the semitruck he was following when he passed Heffner-Dewitt's police car.

¶ 38　　　　Kocher explained that two of defendant's exhibits were screen captures taken from the video recorded by Heffner-Dewitt's police car as he pursued defendant's car before the traffic stop. Kocher noted that there were four white dashes from the interstate's center line between defendant's car and the semitruck. Kocher cited the IDOT marking standard and explained that the presence of the four white lines indicated that defendant was at least 130 feet behind the semitruck prior to the traffic stop.

¶ 39　　　　The State objected to Kocher's testimony about distance, arguing that the defense neither established that the interstate markings present on the video followed the IDOT standards nor that anyone measured the pavement markings. Morris responded by arguing that Hart's testimony was sufficient to establish that the IDOT pavement marking standard would have been followed on I-55.

¶ 40　　　　The trial court acknowledged that Hart testified about the standard but ruled that Kocher could not testify about the distance between defendant's car and the semitruck because no

one actually measured the interstate pavement markings.

¶ 41        Morris asked Kocher whether he measured the distance between the interstate pavement center lines, and Kocher explained that he measured the lines on the morning of the hearing. The State objected on relevancy grounds and explained that the lines would have been changed when the final pavement markings were placed in December 2020. Morris responded that the lines might have been refreshed, but "they keep the same standard." The trial court sustained the State's objection. The court allowed Morris to make an offer of proof. According to Kocher, just before Heffner-Dewitt stopped defendant's car, he was 130 feet behind the semitruck.

¶ 42        Morris asked Kocher whether he was able to determine the length of defendant's car. He responded that he was able to do so based on his review of cars.com and edmunds.com. The State objected and argued that Kocher failed to measure defendant's actual car length. The trial court sustained the objection and ruled that the defense failed to lay a sufficient foundation to demonstrate that defendant's car "was the standard vehicle without any changes made to it or anything like that and whether the comparison that [Kocher] made was to his actual vehicle."

¶ 43                                        5. *John Finnegan*

¶ 44        Morris called John Finnegan, an Illinois State Police telecommunicator. Morris attempted to question Finnegan about a seven-page computer-aided dispatch (CAD) document titled "Incident Detailed Report." Finnegan testified that the document was a record from his office and memorialized Heffner-Dewitt's stop of a vehicle at around 1:02 p.m. on June 1, 2018. The State objected on hearsay grounds, and the trial court sustained that objection. Morris told the court that he would attempt to demonstrate that the CAD document was a business record. Finnegan testified that the document did not quite look the same as the documents he prepares in response to Freedom of Information Act (5 ILCS 140/1 *et seq.* (West 2022)) requests but that the

document's contents were consistent with the reports he generates.

¶ 45     Morris asked whether the CAD document showed the nature of the communications between Heffner-Dewitt and dispatch. The State objected on hearsay grounds, and the trial court sustained that objection. Morris, again, asked Finnegan about the content of the CAD document, and the court, again, sustained the State's hearsay objection.

¶ 46                    6. *Argument and the Trial Court's Decision*

¶ 47     During arguments, Morris asserted that defendant's car was "in no way, shape or form within the distance required to be a violation [for following too closely]." He also argued that Heffner-Dewitt's decision to remove defendant from his car and ask him numerous questions was unnecessary and prolonged the stop.

¶ 48     The State argued that the speed of a vehicle "is integral and very important to determine whether or not a vehicle is following too closely." It noted that no evidence was presented about the speed of defendant's car during the suppression hearing. The State asserted that, based on the video, defendant's car was less than or "right around" two seconds behind the semitruck and, as a result, a reasonably cautious person could believe that an offense had been committed.

¶ 49     The trial court denied the motion to suppress and explained as follows:

   "But [Heffner-Dewitt] clearly indicated from his position, first of all, understanding that he is out there on a specific traffic detail looking for these types of traffic violations going into a construction zone, that he was concerned based upon the speed of the vehicles as well as the distance between them, he felt that the Defendant's vehicle was too close to the semitrailer; and his intention of course as we all know was to write a warning ticket.

He did I think articulate reasonable articulable suspicion or probable cause to stop the vehicle in the first place. I think the statute clearly allows that discretion for him. They are coming into a traffic, construction zone. The, perhaps the angles or views are different when you wide angle and all the work that Mr. Kocher did which may be relevant to whether or not the defendant is guilty beyond a reasonable doubt but does not obviate the reasonable articulable suspicion that Deputy, or Master Sergeant Heffner[-]Dewitt had at that time. So, I do think there was reasonable articulable suspicion to stop the vehicle."

¶ 50 The trial court also concluded that there was no evidence that the stop was prolonged and that, if the stop was delayed, it was because defendant attempted to flee the scene.

¶ 51 On the last day of the suppression hearing, the trial court addressed a third motion to suppress submitted by Morris the night before, asking Morris why the third motion to suppress was not filed "in the first place." Morris explained that he was not able to have an expert review the canine's records and could not file the motion to suppress until the expert determined that "it might have been mishandled." After some discussion, the court summarized:

"Mr. Morris, so basically you had everything that you needed except for the expert; and you never advised me which I said over and over delaying on the supplemental motion that you had an expert; and we got that expert; and I gave you multiple continuances in order to retain that expert; and now all of a sudden you have a second expert that you are telling me you are trying to retain. That was never brought to my attention."

¶ 52 Morris explained that he could not file a third motion to suppress until he had sufficient evidence that the canine's alert "was mishandled as far as the arrest." The State argued

that because defendant was taken into custody after he fled, the drugs would have been inevitably discovered during an inventory search. The trial court denied leave to file the third motion to suppress.

¶ 53                                    D. The Jury Trial

¶ 54            In May 2022, the trial court conducted defendant's jury trial. During the trial, the State presented evidence showing that defendant had possessed 500.5 grams of a white powder containing cocaine in his car. Several witnesses testified; among them, Heffner-Dewitt testified consistently with his testimony at the suppression hearing. Defendant did not testify. The State played a video of the traffic stop for the jury. Ultimately, the jury found defendant guilty of unlawful possession with the intent to deliver a controlled substance (cocaine).

¶ 55                               E. The Posttrial Proceedings

¶ 56            In July 2022, the trial court conducted a hearing on defendant's posttrial motion and sentencing. At the start of the hearing, defendant raised several claims of ineffective assistance and his desire to proceed *pro se*. The court conducted a preliminary inquiry into defendant's *pro se* claims of ineffectiveness pursuant to *Krankel* and concluded that the appointment of new counsel was not warranted. The court also denied defendant's request to proceed *pro se*.

¶ 57            Having denied defendant's request to proceed *pro se*, the trial court invited Morris to argue the motion for a new trial and judgment notwithstanding the verdict. He argued that the court made several errors regarding the motion to suppress and the State "failed to show a chain of evidence in the drug evidence" introduced at trial. The court rejected all of defendant's claims of error.

¶ 58            The trial court moved on to the sentencing portion of the hearing and noted that it had received the presentence investigation report (PSI). The court asked if the parties had any

objections or modifications to the PSI. The only modification the parties requested regarded a minor correction to defendant's criminal history. The court stated that it would take notice of that correction.

¶ 59    The State argued that "that deterrence, the threat of harm to society as well as the Defendant's prior history of delinquency and his lack of potential for rehabilitation *** are strong factors for the Court to consider." The State emphasized that defendant had multiple serious prior convictions, including a 1991 conviction for first degree murder, a 2005 conviction for aggravated battery, a 2006 conviction for unlawful possession with intent to deliver cannabis, and a 2016 conviction for unlawful delivery of cannabis. The State further pointed out that (1) defendant was 46 years old at the time of the offense and (2) he possessed 500.5 grams of cocaine, which was 100 grams greater than the threshold of 400 grams necessary to convict him of the Class X version of possession with intent to deliver a controlled substance. Ultimately, the State recommended that defendant be sentenced to 45 years in prison.

¶ 60    Morris argued that defendant was released from prison for the murder conviction in 2005 and that the two cannabis convictions should not be given serious weight because Illinois had since decriminalized cannabis.

¶ 61    The trial court then rendered the following sentence:

"The statute does generally direct the Court to consider probation as the preferred disposition. In this case, however, the legislature has indicated that this is such a serious offense that you're not even eligible for probation. So, the minimum sentence prescribed is, I think it was 12 years; and the maximum is 50 years so that tells me that this is a very serious matter. The legislature has directed the Court to take this into consideration as a very serious matter.

There are a number of factors in aggravation in this case. I do agree with the State that deterrence is a strong, very strong factor in this case, particularly if it's true that you were playing some kind of minor league softball. For the life of me, I don't know why you would have that potential and be running around with 500 grams of cocaine and delivering back and forth. You've got one person to blame for that, and that's you. You risked it all. Not, [*sic*] you can't blame anybody else; and you can't blame Mr. Morris or, you know, the hearings didn't go how you wanted, or the witnesses didn't get called. I think your bigger problem with this case is the facts. There's only so much that an attorney can do in a case such as this.

So, deterrence is a very strong factor. It's one thing if you are a drug addict and you are trying to deal with your addiction, trying to overcome an addiction. Here, you are part of the problem not only, but you are contributing and making it worse and, as the State argued, potentially hitting up to 500 or a thousand people with the amount of drugs that you had in your possession. So that's, you know, that's pretty serious stuff, at least here in Central Illinois.

\* \* \*

\*\*\* All right. So obviously the Defendant's prior record is a factor in aggravation, particularly that you were on probation at the time the offense was committed.

I do also find that there is a threat of harm to the community, particularly when you are dealing with that amount of a controlled substance.

So, this is definitely a case that the legislature has told the Court, hey, look, take this matter very seriously. This is the kind of conduct that we simply cannot

- 14 -

have going on, and that is something for the Court to look at when I look at the range. This is not a low end of the range case.

I really don't think there are very many, actually I don't think there are any factors in mitigation that are present in this case. I understand and accept Mr. Morris's argument concerning the fact that with the exception of the 1991 conviction out of St. Clair County you are talking about cannabis, which is kind of a different level than a controlled substance I would say; and I understand that argument. However, you were on probation for delivery of cannabis when you elevated to this level, 500 grams of a controlled substance.

So, I just, there just is nothing in [mitigation] that the Court can find. I know, [defendant], you've done everything you can personally and through Counsel to, to maintain your innocence in this case. You have put up what I would say is one of the best arguments as far as a motion to suppress is concerned for the basis of the stop; but the reality is the reality; and you are just not going to be able to put that off any longer.

I think in this case it is appropriate that you be sentenced to the Department of Corrections for a period of 35 years. That is at 75% good time, which would be 26 and a quarter years. There's another one year good conduct credit that you may qualify for so that's 25 and a quarter years, and then you have credit for over four years and about two months. You are probably being at [*sic*] roughly 21 years in the Department of Corrections on this case plus the one year six month parole."

¶ 62                                    F. The First Appeal

¶ 63         In July 2022, defendant appealed, arguing, among other things, that the trial court

- 15 -

erred by failing to appoint new counsel to investigate and present his *pro se* claims of ineffective assistance. In June 2023, this court remanded this case for the appointment of *Krankel* counsel and further proceedings on defendant's claims of ineffective assistance of counsel, noting that defense counsel filed an "untimely third motion to suppress and did not refer to any expert in the proposed third motion to suppress." *Maury*, No. 4-22-0887 (2023) (unpublished summary order under Illinois Supreme Court Rule 23(c)). This court did not consider the merits of defendant's other claims raised on appeal. *Id.*

¶ 64                    G. The Proceedings on Remand

¶ 65            On remand, the trial court appointed new counsel (*Krankel* counsel), who filed a "Motion to Vacate Conviction and Appoint Effective Counsel." In that motion, *Krankel* counsel argued that Morris provided ineffective assistance by failing to (1) properly make a *prima facie* case for suppression or otherwise shift the burden of proof to the State, (2) elicit any evidence regarding the improper employment of the drug detection animal, and (3) provide authority for his argument that the canine alert required proof that the animal had been properly trained.

¶ 66            In May 2024, the trial court conducted a hearing on that motion.

¶ 67            *Krankel* counsel argued that this case came down to whether the trial court would have granted the motion to suppress with effective counsel. *Krankel* counsel argued that (1) reasonable counsel would have formally shifted the burden of production to the State and (2) had Morris done so here, the State would not have been able justify defendant's detention and arrest. *Krankel* counsel noted that on the second day of the motion to suppress hearing, the officers had not been subpoenaed, and precedent would not have allowed the State to continue the case to secure its witnesses once defendant made a *prima facie* case for suppression. Further, Morris's strategy to focus on the specific distance defendant's car was from the semitruck he was following

was irrelevant to whether Heffner-Dewitt had a reasonable suspicion to justify the traffic stop.

¶ 68　　　　　The State argued that Morris acted reasonably by not calling defendant as a witness to shift the burden of production because defense lawyers frequently relied only on the testimony of the officers who conducted the traffic stop to support motions to suppress. In addition, the State argued that it would have been able to proceed on the motion to suppress despite the absence of Illinois State Police witnesses because the officer who made the decision to conduct the traffic stop, Heffner-Dewitt, was present as a witness. Regarding the dog sniff, the State contended that there was no evidence to indicate that the dog was unable to reliably alert to the presence of contraband while performing an open-air sniff.

¶ 69　　　　　*Krankel* counsel responded that (1) Morris's strategy to provide objective evidence that defendant's car was not following the semitruck in front of him too closely, rather than simply shift the burden to the State, was unreasonable and (2) the motion would have been successful had Morris shifted the burden to the State.

¶ 70　　　　　After hearing the arguments, the trial court took the motion under advisement and subsequently entered a written order (1) denying the motion and (2) rejecting defendant's ineffective assistance claims.

¶ 71　　　　　Regarding the first claim, the trial court found as follows:

　　　　　　"This is not a situation where defense counsel failed to call a relevant witness or cross-examine a witness or completely overlooked relevant and admissible evidence. He presented several witnesses, all of whom he thoroughly examined under oath, and tendered multiple exhibits. In fact, trial counsel presented more evidence to support his argument concerning reasonable articulable suspicion, than the court usually receives. In the end, the evidence showed that the defendant

- 17 -

made a *prima facie* showing of a warrantless search and seizure; and the State showed by a preponderance of the evidence that there was reasonable articulable suspicion for the stop, and that the stop was not unduly prolonged in light of defendant's attempt to flee the scene while [Heffner-Dewitt] was writing the warning ticket and before the free air sniff was conducted. There is nothing objectively unreasonable about how the evidence was presented in regards to the motion to suppress, nor in trial counsel's failure to formally shift the burden of proof."

¶ 72    Regarding the allegations related to the dog sniff, the trial court found that both the public defender who drafted the original motion to suppress and Morris had (1) reviewed "the dash cam video and K9 Steele's training and deployment records" and (2) reasonably decided to pursue the strongest argument for suppression, which was to challenge the basis for the traffic stop. The court pointed out that Morris "made every reasonable argument he could to show that his client was not following the vehicle in front of him too closely, even attempting to admit evidence that he may very well have known was not admissible as expert testimony." Further, the record reflected defendant was "a difficult and pushy client," and any issues regarding the dog sniff were "flushed out by the defendant long before the public defender or [Morris] got involved in the case." The court proposed that the only reason Morris amended the motion to suppress to include a challenge to the dog sniff was at "defendant's insistence that he make the argument, [rather] than [Morris's feeling that] he had a strong argument in the first place."

¶ 73    Ultimately, the trial court found that nothing in the record overcame the strong presumption that Morris's decisions were the result of reasonable trial strategy and, even assuming deficient performance for failing to provide evidence to support the dog sniff argument, (1) it was

"highly unlikely that defendant could have shown that K9 Steele was not properly trained and/or did not indicate on the vehicle as trained" and (2) the evidence presented showed that the free-air sniff took place only after defendant attempted to flee the scene. The court referred the case back to this court.

¶ 74    In July 2024, this court filed an order recalling the mandate and ordering supplemental briefing addressing the trial court's decision denying defendant's ineffective assistance claims.

¶ 75    This appeal followed.

¶ 76                II. ANALYSIS

¶ 77    Defendant appeals, arguing (1) the trial court erred by (a) denying his motion to suppress evidence obtained from an improper traffic stop, (b) sustaining numerous State objections and limiting defense counsel's ability to challenge the validity of the traffic stop, (c) denying defendant's request to proceed *pro se* following trial, and (d) considering a factor inherent in the offense of possession with intent to deliver when imposing sentence and (2) *Krankel* counsel provided ineffective assistance by failing to adequately present his claims of ineffective assistance of defense counsel. We disagree and affirm.

¶ 78                A. The Motion To Suppress

¶ 79    Defendant first argues that the trial court erred by denying his motion to suppress because the State failed to establish that Heffner-Dewitt had a reasonable articulable suspicion for the traffic stop that preceded the search of defendant's car.

¶ 80                1. *The Applicable Law and Standard of Review*

¶ 81    "A police officer may conduct a brief, investigatory stop of a person where the officer can point to specific and articulable facts which, taken together with rational inferences

- 19 -

from those facts, reasonably warrant the intrusion." (Internal quotation marks omitted.) *People v. Hackett*, 2012 IL 111781, ¶ 20. The officer's belief does not need to meet the level of suspicion necessary for probable cause. *Id.*

¶ 82         "In determining whether a trial court has properly ruled on a motion to suppress, findings of fact and credibility determinations made by the trial court are accorded great deference and will be reversed only if they are against the manifest weight of the evidence." *People v. Slater*, 228 Ill. 2d 137, 149 (2008). This court reviews *de novo* the trial court's decision whether to deny a motion to suppress. *People v. Drain*, 2023 IL App (4th) 210355, ¶ 24.

¶ 83                                   2. *This Case*

¶ 84         Here, defendant argues that Heffner-Dewitt did not have a reasonable articulable suspicion to conduct the traffic stop of defendant's vehicle based on defendant's following too closely to a semitruck because Heffner-Dewitt's dashcam footage shows that defendant was following the semitruck at a greater distance than testified to by Heffner-Dewitt.

¶ 85         After reviewing the dashcam footage and hearing testimony on the matter, the trial court found Heffner-Dewitt to be a credible witness. The court correctly recognized that the issue was not whether defendant was "guilty of following too closely," but whether Heffner-Dewitt had a "reasonable articulable suspicion to believe that the traffic law ha[d] been violated." The court found that from Heffner-Dewitt's position in the median of I-55, defendant appeared to have been following too closely. Although the court noted that "perhaps the angles or views are different" in the video footage because of the wide-angle lens, the court concluded that the footage did not refute that Heffner-Dewitt had reasonable suspicion for the traffic stop.

¶ 86         The trial court's conclusion is supported by the record. According to Heffner-Dewitt, his car was positioned in the median facing north and defendant's vehicle was southbound,

headed into a construction zone. From his perspective and based on defendant's speed, he believed defendant to be following too closely. The infraction occurred before defendant reached the officer's position, and he estimated that defendant was a "couple car lengths maybe" behind the semitruck. Further, the video evidence is consistent with defendant's vehicle's being closer to the semitruck and slowing down as he approached Heffner-Dewitt's vehicle.

¶ 87 Accordingly, we conclude that (1) the trial court's findings were not against the manifest weight of the evidence and (2) the court properly denied the motion to suppress.

¶ 88 B. Forfeited Arguments

¶ 89 Defendant argues that he did not have a reasonable opportunity to challenge Heffner-Dewitt's decision to stop his car because the trial court improperly (1) sustained multiple hearsay objections during the suppression hearing and (2) refused to allow an additional replaying of the dashcam video. He also argues that the court erred during sentencing by considering a factor inherent in the offense of possession with the intent to deliver a controlled substance as a factor in aggravation.

¶ 90 Defendant concedes that he forfeited these issues for review both by failing to object when these issues arose in the trial court and by failing to raise them in a posttrial motion. See *People v. Johnson*, 2024 IL 130191, ¶ 40 (requiring a defendant to object to and raise the alleged error in a posttrial motion to avoid forfeiture). Nonetheless, he contends that we may consider his claims regarding the motion to suppress hearing as second-prong plain error and the sentencing claim for first- and second-prong plain error. *Id.* ¶ 43. We reject defendant's claims.

¶ 91 1. *Plain Error, Generally*

¶ 92 The plain error doctrine allows reviewing courts to review a forfeited error if the error falls under one of the following two prongs:

"(1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Moon*, 2022 IL 125959, ¶ 20.

¶ 93　　　　The usual first step in a plain error analysis is to determine whether a clear and obvious error occurred. *Johnson*, 2024 IL 130191, ¶ 44. That is true because if there is no error, then there can be no plain error. *People v. Tolliver*, 2021 IL App (1st) 190129, ¶ 36. "However, similar to the analytical framework we use to review a claim of ineffective assistance of counsel [citation], the first step of plain-error analysis is merely a matter of convention," and we may begin the analysis in any order. (Internal quotation marks omitted.) *People v. Bowens*, 407 Ill. App. 3d 1094, 1108 (2011). If either prong of the plain error doctrine is not met, then a defendant's plain error claim fails. *Id.*

¶ 94　　　　　　　　　　　2. *The Evidentiary Rulings*

¶ 95　　　　Here, defendant argues that the trial court's sustaining the following objections constituted second-prong plain error: (1) the introduction of Heffner-Dewitt's "verified statement of arrest," (2) a question to Heffner-Dewitt about whether any other changes needed to be made to that document, (3) the use of a transcript of Heffner-Dewitt's discussion with defendant during the traffic stop, (4) the use of a seven-page CAD document titled "Incident Detailed Report" to question Finnegan to establish the traffic stop was unreasonably prolonged, and (5) replaying a video of the stop for Heffner-Dewitt because he had not watched the entire video for "a while."

¶ 96　　　　Defendant contends that this case can be likened to *People v. Walker*, 232 Ill. 2d

113 (2009). However, the rights involved and the actions of the trial court in the present case could not have been more different than in *Walker*.

¶ 97    In *Walker*, defense counsel informed the trial court that counsel was not prepared for the defendant's bench trial and requested a continuance. *Id.* at 117. The court denied the request, saying, " 'It is irrelevant. There isn't a private attorney in the business who hasn't tried to pull something like this.' " *Id.* Counsel explained that she was not initially appointed in the case, and the court replied, " 'I know, but it is a dirty shame.' " *Id.* at 118. The court then proceeded to the bench trial, at which it found the defendant guilty. *Id.* The appellate court affirmed, and the supreme court reversed, explaining, "The result of the [trial] court's utter failure to exercise discretion in denying the continuance request was to force defendant to go to trial on double-murder charges despite defense counsel's repeated statements that she was unable to proceed because of lack of preparation." *Id.* at 130. Ultimately, the supreme court concluded "this error was so serious that it demonstrably affected the fairness of defendant's trial and challenged the integrity of the judicial process." *Id.* at 131.

¶ 98    Here, defendant does not argue that he was substantively denied the ability to put on a defense *at trial*, only that *during a suppression hearing*, he was not allowed to conduct his examination of the witnesses and present evidence in *the specific manner of his choosing*. The record shows that defendant played numerous videos and demonstrative exhibits of the traffic stop for the trial court and attempted to impeach Heffner-Dewitt using the video exhibits and the contents of an arrest synopsis he prepared for the jail, among other things. And, although the court mentioned hearsay as a reason to sustain the State's various objections, it had other reasons for doing so. For example, the objection to the verified statement of arrest was sustained on relevancy grounds. The trial court's evidentiary rulings were far from the utter failure to exercise the court's

discretion addressed in *Walker*.

¶ 99 Generally, second-prong plain error has been equated to a very narrow group of structural errors "that defies harmless error analysis." *People v. Ratliff*, 2024 IL 129356, ¶ 37. Evidentiary errors are subject to harmless error analysis. See *People v. Pinkett*, 2023 IL 127223, ¶ 39 (" '[E]videntiary error is harmless "where there is no *reasonable probability* that the jury would have acquitted the defendant absent the" error.' " (Emphasis in original.) (quoting *In re E.H.*, 224 Ill. 2d 172, 180 (2006), quoting *People v. Nevitt*, 135 Ill. 2d 423, 447 (1990))).

¶ 100 In sum, defendant does not persuade us that the trial court's alleged misunderstanding of hearsay evidence at a suppression hearing had a pervasive effect on the fairness of the proceeding. Accordingly, we honor defendant's procedural forfeiture of these issues. See *Tolliver*, 2021 IL App (1st) 190129, ¶ 36 (honoring forfeiture if either prong of the plain error doctrine is not met). We conclude that defendant's second-prong plain error claim in this case is completely without merit.

¶ 101                                    3. *The Sentencing Claim*

¶ 102 Defendant next argues that the trial court committed first-prong or second-prong plain error by improperly considering the harm posed by the possession and sale of controlled substances as a factor in aggravation when it stated as follows:

> "I do also find that there is a threat of harm to the community, particularly when you are dealing with that amount of a controlled substance.
>
> So, this is definitely a case that the legislature has told the Court, hey, look, take this matter very seriously. This is the kind of conduct that we simply cannot have going on, and that is something for the Court to look at when I look at the range. This is not a low end of the range case."

¶ 103    We disagree.

¶ 104    a. Sentencing, Generally

¶ 105    A trial court has broad discretion in imposing a sentence. *People v. Patterson*, 217 Ill. 2d 407, 448 (2005). "The trial court must base its sentencing determination on the particular circumstances of each case, considering such factors as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age." *People v. Fern*, 189 Ill. 2d 48, 53 (1999). "It is also required to consider statutory factors in mitigation and aggravation; however, 'the court need not recite and assign a value to each factor it has considered.' " *People v. Pina*, 2019 IL App (4th) 170614, ¶ 19 (quoting *People v. McGuire*, 2017 IL App (4th) 150695, ¶ 38). We presume that a sentencing court considered all relevant factors, including factors in mitigation. *People v. Halerewicz*, 2013 IL App (4th) 120388, ¶ 43.

¶ 106    "In determining whether the trial court based the sentence on proper aggravating and mitigating factors, a court of review should consider the record as a whole, rather than focusing on a few words or statements by the trial court." *People v. Dowding*, 388 Ill. App. 3d 936, 943 (2009). The court, when "announcing its sentencing decision, is not required to refrain from any mention of the factors that constitute elements of an offense, and the mere reference to the existence of such a factor is not reversible error." *People v. Brown*, 2018 IL App (1st) 160924, ¶ 22. Indeed, although the trial court may not consider a factor implicit in the offense as an aggravating factor in sentencing, it may consider the nature and circumstances of the offense, including the nature and extent of each element of the offense committed by the defendant. *People v. Bowen*, 2015 IL App (1st) 132046, ¶ 50.

¶ 107    "Sentencing hearings do not occur in a vacuum, and the duty to impose a fair sentence entails an explanation of the court's reasoning in the context of the offenses of which a

defendant has been convicted." *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 15 (explaining a trial court's comments on the nature and circumstances of a defendant's crime do not necessarily result in improperly using elements of the offense as factors in aggravation).

¶ 108                                    b. This Case

¶ 109          Here, defendant was convicted of violating section 401(a)(2)(C) of the Illinois Controlled Substances Act (720 ILCS 570/401(a)(2)(C) (West 2018)), which is a Class X felony when the offender possesses more than 400 grams of a controlled substance. The trial court noted that defendant possessed 500.5 grams of cocaine when he was arrested, 100 grams more than the minimum amount proscribed by statute. In particular, the court explained that the amount of cocaine in defendant's possession had the potential to reach between 500 to 1,000 people in the community. This court has held that a trial court is statutorily permitted to consider the amount of cocaine as a relevant sentencing factor, as well as its impact on the community. *People v. McGath*, 2017 IL App (4th) 150608, ¶ 73 ("[A] trial court may discuss the impact a drug offense has on the community without subjecting the defendant to double enhancement."); see 720 ILCS 570/411(2) (West 2018) (referring to "offenses involving unusually large quantities").

¶ 110          In making this assessment, "the sentencing court compares the conduct in the case before it against the minimum conduct necessary to commit the offense." *People v. Hibbler*, 2019 IL App (4th) 160897, ¶ 67. Here, that minimum conduct is defendant's possessing 400 grams of cocaine. Although defendant's argument might have had some merit had the trial court found that he possessed that minimum amount of cocaine, defendant possessed 500.5 grams—100 grams more than that minimum amount. As this court explained in *Hibbler*, " ' [T]he commission of any offense, regardless of whether the offense itself deals with harm, can have varying degrees of harm or threatened harm.' " *Id.* (quoting *People v. Saldivar*, 113 Ill. 2d 256, 269 (1986)). In the context

of possession crimes, a sentencing court does not err by considering the amount of the drug possessed and the potential harm to the community that amount could cause.

¶ 111　　　　We emphasize that we have rejected this sort of claim in multiple cases in which, like the present case, the defendant's conduct exceeded the minimum conduct necessary to commit the offense. See, *e.g.*, *People v. Hood*, 2024 IL App (4th) 230102-U, ¶¶ 31-35 (considering the seriousness of the victim's injuries that served as the basis for the great bodily harm element in an aggravated domestic battery case); *People v. Shaw-Sodaro*, 2023 IL App (4th) 220704, ¶ 70 (considering the age of the victim in an aggravated criminal sexual abuse case); *People v. Williams*, 2022 IL App (4th) 210526-U, ¶ 38 (considering the location of the shooting in an aggravated battery with a firearm case).

¶ 112　　　　Because we conclude that the trial court committed no error at defendant's sentencing hearing, there was, of course, no clear and obvious error. Accordingly, we honor defendant's procedural forfeiture.

¶ 113　　　　　　　　　　　C. The Request To Proceed *Pro Se*

¶ 114　　　　Defendant argues that the trial court erred by denying his request to proceed *pro se* following his trial. We disagree.

¶ 115　　　　　　　　　　　1. *The Applicable Law and Standard of Review*

¶ 116　　　　"In order to invoke the right to self-representation[,] a defendant must knowingly and intelligently waive the right to be represented by counsel. [Citations.] Such waiver must be clear, unequivocal, and unambiguous." *People v. Rodriguez-Aranda*, 2022 IL App (2d) 200715, ¶ 33. However, a trial court may deny a defendant's request for self-representation when, among other reasons, a defendant's lack of civility and decorum would result in an abuse of the dignity of the courtroom, or when a defendant abuses the right to waive counsel as a tactic to delay or

disrupt proceedings. *Id.*

¶ 117 We review a trial court's denial of a defendant's request to represent himself for an abuse of discretion. *People v. Rainey*, 2019 IL App (1st) 160187, ¶ 33. A court abuses its discretion when its ruling is arbitrary and without a logical basis. *Id.*

¶ 118                                        2. *This Case*

¶ 119 In July 2022, the trial court conduced a hearing on defendant's posttrial motion, which had been prepared by Morris. At that hearing, defendant told the court that he had concerns about Morris's representation, which defendant explained he had set forth in a *pro se* motion, which he believed he had filed. In response, the court conducted a *Krankel* inquiry to ascertain defendant's claims, after which it concluded that none of the claims rose to such a level that necessitated appointing new counsel.

¶ 120 Thereafter, when defendant asked to proceed *pro se* at the hearing on the posttrial motion and sentencing, the trial court denied his request, stating that it viewed the request as an attempt to thwart the administration of justice and to delay the proceedings, noting that the case had already been continued numerous times at defendant's request and defendant had spent "1500 plus days in the Livingston County Jail."

¶ 121 Defendant's argument on appeal rests primarily on the following response the trial court gave to defendant when denying his request to proceed *pro se*:

> "All right. I'm not 100% sure that you even have a right to do that at this stage of the proceeding because you had Mr. Morris represent you throughout the trial. I understand you requested a continuance. I denied it, and I think ultimately you decided to go forward with Mr. Morris representing you rather than go *pro se* during the trial. And so we are still in that stage; and I do believe, unless anybody

- 28 -

wants to bring something else to my attention, but at this point I think that we are so far into the trial that the Defendant, this is kind of the natural sequence of the trial; and I don't think that you have the right at this point to change paths and now go *pro se*. You chose to have Mr. Morris represent you for the trial instead of go *pro se*, and this is the consequence of the trial and more importantly any post-trial motions.

So, I don't think that you have a legal right at this stage of the trial proceeding to go *pro se*. I could be mistaken about that. I'm sure the Appellate Court will clarify that; but I think it would be, it would make no sense to have somebody else argue the judgment notwithstanding the verdict motion and the sentencing. That's still I think part of the underlying trial itself."

¶ 122      Defendant argues that (1) the trial court had discretion to allow him to proceed *pro se* and (2) a finding that defendant was trying to proceed *pro se* only for the purpose of abuse or delay of the criminal justice system was erroneous. Defendant contends the record shows that when he was requesting to proceed *pro se*, he understood he could not use it as a tactic to delay the proceedings. Accordingly, he argues the court's denial of his request to proceed *pro se* constituted a structural defect requiring reversal.

¶ 123      The State responds that (1) the trial court did not deny defendant's request in a vacuum and (2) the record demonstrates that his eleventh-hour request was reasonably denied because it was part of a series of disruptive and dilatory conduct similar to the defendant's conduct in *Rainey*. *Id.* ¶ 61 ("Given defendant's alternating positions and the eleventh-hour timing of his request, his third demand for self-representation could be reasonably deemed vacillating and dilatory."). The State notes that in *Rainey*, a defendant's lack of civility and decorum was a "valid

basis for denying his request for self-representation." *Id.* ¶ 74.

¶ 124　　　　Here, shortly after the initial trial court proceedings began, the court allowed defendant to proceed *pro se* and granted numerous continuances, delaying the proceedings for several years while he prepared to litigate a motion to suppress. That delay culminated in defendant's requesting counsel to be appointed at the beginning of the scheduled hearing on the motion to suppress, which the court granted. At that time, the trial court warned defendant that it would "not play[ ] this game again where you decide on the eve of trial or the eve of a hearing that you want to decide to go by yourself." Subsequently, Morris appeared as defendant's third attorney, replacing the public defender.

¶ 125　　　　The record shows that, throughout the proceedings in this case, there were many instances in which defendant talked over the trial court or raised his voice at the court. On one occasion, he was removed from the courtroom because he continued to argue with the court, despite multiple warnings to stop. At the end of that hearing, the court noted that defendant became physically aggressive.

¶ 126　　　　At the posttrial hearing, defendant attempted to file multiple motions on his own behalf, in addition to his claims of ineffective assistance. Defendant told the trial court about his problems with Morris and that he was waiting for his family to hire another attorney. He also stated that he wanted to argue his motions *pro se*.

¶ 127　　　　The trial court asked him multiple times if he wanted to proceed *pro se*, but defendant did not directly respond. The court conducted the *Krankel* inquiry and determined that new counsel was not warranted. At one point during that hearing, the court threatened to remove defendant from the courtroom if he continued to be argumentative with the court. Only after being told multiple times that the court would not consider his *pro se* motions and would proceed with

the sentencing hearing did defendant definitively say that he wanted to proceed *pro se*. It was at that point in the proceedings when the court rejected the request.

¶ 128        When placed in context of the entire proceedings, including the posttrial hearing, defendant's desire to proceed *pro se* may have been clear, but it was not unequivocal. See *id.* ¶ 45 ("A defendant could clearly request self-representation, as here, but the circumstances may reveal that a defendant has constantly waffled back and forth on the matter, whether inadvertently or strategically, requesting self-representation every time a legal ruling did not go his way or every time a trial date approached, only to quickly change his mind upon being required to actually undertake his defense without a lawyer."). Defendant's discussion with the trial court about wanting new counsel appointed, waiting for his family to hire a new lawyer, and his attempt to obtain a continuance, when considered in the full context of all of the proceedings in this case, show that his request to proceed *pro se* was far from being unequivocal. Accordingly, we conclude that the trial court did not abuse its discretion by denying defendant's request.

¶ 129        Regarding the trial court's musings about whether defendant had the right to proceed *pro se* at sentencing, the full context of the court's statements shows that its decision was not based on some misunderstanding of the law. Following the court's statements, the prosecutor reminded the court that its denial of defendant's request was consistent with case law when the request occurs at "late stages in the case" and a defendant has been "flip-flopping on that issue." The court agreed and explained that it believed the request was part of "an ongoing effort on [defendant's] part to thwart the administration of justice and unduly delay the[ ] proceedings." Accordingly, these isolated statements did not render the court's ruling an abuse of discretion.

¶ 130                D. Ineffective Assistance of *Krankel* Counsel

¶ 131        Next, defendant argues that this case should be remanded for a new evidentiary

hearing on his posttrial claims of ineffective assistance of trial counsel because *Krankel* counsel provided ineffective assistance by failing to "present any evidence, [or] argue the substantive merit of a majority of [defendant's] *Krankel* claims"—namely, the claims that Morris was ineffective for failing to (1) properly challenge the canine alert, (2) properly question Finnegan about the CAD report and render the report admissible evidence, and (3) call defendant as a witness at the motion to suppress hearing—and, instead, made a procedural argument that had no likelihood of success. We disagree.

¶ 132                    1. *The Applicable Law and Standard of Review*

¶ 133                       a. The *Krankel* Procedure, Generally

¶ 134          *Pro se* posttrial claims alleging ineffective assistance of counsel are governed by the common-law procedure developed by the supreme court in *Krankel*, 102 Ill. 2d at 189, and refined by its progeny, like *People v. Roddis*, 2020 IL 124352, ¶ 34. "The procedure encourages the trial court to fully address these claims and thereby narrow the issues to be addressed on appeal." *Id.* Under the supreme court's procedures, the trial court examines a defendant's claim by first conducting some type of inquiry into the underlying factual basis of the defendant's *pro se* ineffective assistance of counsel claim. *People v. Ayres*, 2017 IL 120071, ¶ 11.

¶ 135          If the trial court determines that "the allegations show possible neglect of the case, new counsel should be appointed." *Roddis*, 2020 IL 124352, ¶ 35. New counsel can then independently evaluate the defendant's claims of ineffective assistance and avoid the conflict of interest trial counsel would have in trying to justify his or her own actions contrary to the defendant's position. *Id.* ¶ 36. New counsel also represents the defendant at the hearing on the *pro se* ineffective assistance of counsel claim. *Id.*

¶ 136          The supreme court has observed that "the purpose of the *Krankel* procedure is to

establish a factual basis of the defendant's *pro se* claim of ineffective assistance of counsel, to create a record, and to limit the issues on appeal." *In re Johnathan T.*, 2022 IL 127222, ¶ 43.

¶ 137                                    b. Ineffective Assistance of Counsel

¶ 138        A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29; *People v. Cherry*, 2016 IL 118728, ¶¶ 24-30 (applying *Strickland* for a claim of ineffective assistance of *Krankel* counsel). "Under the *Strickland* standard, to prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that his attorney's representation fell below an objective standard of reasonableness and (2) that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different." *People v. Torres*, 2024 IL 129289, ¶ 27. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (Internal quotation marks omitted.) *People v. Carroll*, 2024 IL App (4th) 231207, ¶ 87.

¶ 139        "A defendant's failure to satisfy either prong of the *Strickland* standard precludes a finding of ineffective assistance of counsel." *Torres*, 2024 IL 129289, ¶ 27.

¶ 140                                        2. *This Case*

¶ 141        Defendant argues that *Krankel* counsel provided ineffective assistance because counsel did not present all of defendant's nonfrivolous claims of ineffective assistance. In support, defendant cites (1) *People v. Downs*, 2017 IL App (2d) 121156-C, ¶ 50 (requiring *Krankel* counsel to "to present any nonfrivolous claim to the trial court even where there remains a possibility or even likelihood that the defendant will not prevail on the claim") and (2) *People v. Kyles*, 2020 IL App (2d) 180087, ¶ 46 (When "it is not clear from the record whether counsel fulfilled her duty to independently evaluate defendant's *pro se* claims, we must conclude that counsel failed to act

as *Krankel* counsel at all. As such, prejudice is presumed under *Downs*.").

¶ 142    In response, the State urges this court not to follow the holding in *Downs*, arguing that "*Downs* is poorly reasoned because it represents interference with the constitutionally protected ability of counsel to make independent decisions." We agree with the State that *Downs* misinterprets the requirements of *Krankel* counsel, specifically counsel's discretion to exercise his or her own legal judgment about which trial strategy to pursue.

¶ 143                                              a. *Downs*

¶ 144    In *Downs*, similar to this case, the defendant argued on appeal that appointed *Krankel* counsel had performed deficiently "by abandoning all of defendant's specific allegations of ineffective assistance of trial counsel." *Downs*, 2017 IL App (2d) 121156-C, ¶ 37. Counsel had declined to adopt the *pro se* claims and instead filed a 15-page motion explaining why counsel did not adopt those claims. *Id.* ¶ 82. The State argued that no authority required *Krankel* counsel to adopt and present all nonfrivolous *pro se* claims of ineffective assistance and that counsel's role was to " 'independently evaluate the defendant's claim.' " *Id.* ¶¶ 44, 82 (quoting *People v. Moore*, 207 Ill. 2d 68, 78 (2003)).

¶ 145    In addressing this issue, the Second District examined the following language from the supreme court's decision in *Moore*, 207 Ill. 2d at 77-78:

          "In interpreting *Krankel*, the following rule developed. New counsel is not

          automatically required in every case in which a defendant presents a *pro se* posttrial

          motion alleging ineffective assistance of counsel. Rather, when a defendant

          presents a *pro se* posttrial claim of ineffective assistance of counsel, the trial court

          should first examine the factual basis of the defendant's claim. If the trial court

          determines that the claim lacks merit or pertains only to matters of trial strategy,

then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed. [Citations.] The new counsel would then represent the defendant at the hearing on the defendant's *pro se* claim of ineffective assistance. [Citations.] The appointed counsel can independently evaluate the defendant's claim and would avoid the conflict of interest that trial counsel would experience if trial counsel had to justify his or her actions contrary to [the] defendant's position."

¶ 146    Highlighting the final sentence of this passage, the Second District in *Downs* observed the following:

"[T]his passage [from *Moore*] notes that new counsel would face no conflict of interest in presenting the defendant's arguments to the trial court, whereas trial counsel, in attempting to present those same allegations, would face an impermissible conflict of interest. The independent evaluation of the defendant's allegations must be conducted with an eye toward representing the defendant at the upcoming second-stage adversarial hearing, and not simply with the goal of determining whether, in *Krankel* counsel's opinion, any of the defendant's allegations are substantively meritorious. In other words, properly viewed, *Moore* commands that *Krankel* counsel *be an advocate for the defendant, not for the State or the trial court*. Thus, this passage in *Moore*, contrary to the State's argument, does not justify *Krankel* counsel's conduct in this case; at best, it simply does not support *Krankel* counsel's conduct, and at worst, it demonstrates that *Krankel* counsel's conduct was wholly unsupported by law." (Emphasis in original.) *Downs*, 2017 IL App (2d) 121156-C, ¶ 47.

¶ 147        The Second District, expanding on what being an "advocate for the defendant" required of *Krankel* counsel and focusing on the statement in *Moore* that "[t]he new counsel would then represent the defendant at the hearing on the defendant's *pro se* claim of ineffective assistance" (*Moore*, 207 Ill. 2d at 78), reasoned that *Krankel* counsel was required to present all of those claims with merit at the subsequent evidentiary hearing. *Downs*, 2017 IL App (2d) 121156-C, ¶¶ 47-49. The court then defined "merit" by negation, positing that an attorney's obligation not to make frivolous arguments represented the limits for which *pro se* claims he or she must argue. *Id.* ¶¶ 49-50 ("[A] nonfrivolous claim will have at least an arguable basis in law or in fact, although it might turn out to be unsuccessful.").

¶ 148        The Second District concluded:

> "In spite of the uncertainty, counsel's obligation to represent the defendant requires him or her to present any nonfrivolous claim to the trial court even where there remains a possibility or even likelihood that the defendant will not prevail on the claim. To place this into the context of a *Krankel* inquiry, *Krankel* counsel must sift through the defendant's *pro se* allegations to determine if any are nonfrivolous and then must present those nonfrivolous claims to the trial court during the second-stage adversarial hearing." *Id.* ¶ 50.

¶ 149        Applying that rule to the facts of *Downs* and using the *Strickland* framework, the Second District determined that *Krankel* counsel's decision not to present all of the defendant's nonfrivolous claims fell below an objective standard of reasonableness, not as required by *Strickland*, but by *Krankel*. *Id.* ¶ 56; see *Kyles*, 2020 IL App (2d) 180087, ¶ 46 (in which the Second District followed its earlier decision in *Downs*).

¶ 150                        b. Our Disagreement With *Downs*

¶ 151    For the following reasons, we respectfully disagree with the Second District's interpretation of *Moore* and *Krankel* and, accordingly, will not apply *Downs*'s interpretation of the *Krankel* requirements to the present case.

¶ 152    Neither *Moore*, nor *Krankel*, nor any other authority outside of *Downs* and *Kyles* expressly states that *Krankel* counsel must present all nonfrivolous claims to provide objectively reasonable performance. Even the Second District acknowledges this point in *Downs* but states, without elaboration, "[The requirement that *Krankel* counsel present all nonfrivolous claims] is inferable from the requisites of the attorney-client relationship." *Downs*, 2017 IL App (2d) 121156-C, ¶ 83. This unexplained inference, along with the inference allegedly contained in the court's discussion of *Moore* (*supra* ¶¶ 145-48), is the only authority on which the Second District relied in forming its conclusion. However, neither "the requisites of the attorney-client relationship" nor *Moore* provides any support for that requirement.

¶ 153    Regarding the attorney-client relationship, the Second District does not explain what aspect of that relationship implies, much less *requires* that *Krankel* counsel must present all nonfrivolous claims at the evidentiary hearing. To the contrary, decades of case law evaluating claims of ineffective assistance reaffirm the strong presumptions (1) "that defense counsel's conduct was within the wide range of reasonable professional assistance and all decisions were made in the exercise of reasonable professional judgment" and (2) "the challenged action or inaction may have been the product of sound trial strategy." *Carroll*, 2024 IL App (4th) 231207, ¶ 86.

¶ 154    Curiously, in the same passage concluding that the attorney-client relationship implies that *Krankel* counsel must present all nonfrivolous claims, the Second District responds to the State's assertion that the *Strickland* standard allows for an attorney to winnow out weaker

arguments and focus on stronger arguments with its own assertion that "it is *Krankel*, not *Strickland*, that requires the presentation of all nonfrivolous claims." *Downs*, 2017 IL App (2d) 121156-C, ¶ 83. The *Downs* court points out that "the fact that counsel may winnow the weaker arguments does not excuse him or her from providing representation on the major meritorious issue or issues" and asks, "Why should *Krankel* counsel be held to a lesser standard than any other attorney?" *Id.*

¶ 155    However, the more apt question to ask is why *Krankel* counsel should be held to a *different* standard than any other attorney, because a requirement that counsel argue *all* nonfrivolous claims is simply not and never has been the standard for objectively reasonable performance.

¶ 156    Regarding *Moore*, we completely agree with the Second District's assessment that appointed counsel must be an advocate for the defendant, with an eye toward representing the defendant at the evidentiary hearing. *Supra* ¶¶ 147-48. Indeed, every defense attorney in a criminal case has a duty to be a zealous advocate for his or her client. And that duty is present whether counsel is privately retained, appointed by the court to represent the defendant at trial, or is *Krankel* counsel.

¶ 157    However, our agreement with the Second District ends when the Second District infers that *Krankel* counsel's responsibility to represent a defendant at a subsequent evidentiary hearing requires counsel to present all nonfrivolous claims. We conclude that this inference lacks any legal authority to support it.

¶ 158    We agree with the following observation by the State:

"*Downs*'s constraints shackle attorneys from exercising their independent judgment, skillful advocacy, and experience in how best to represent their clients'

- 38 -

interests. Enforcing *Downs*'s restrictions could actually be detrimental to the interests of every convicted defendant who hopes to rely on the full panoply of new counsel's abilities in how to persuade a court into granting the request for a new trial."

¶ 159 Accordingly, we conclude that *Downs* was wrongly decided and hold that *Krankel* counsel's performance is evaluated under the same standard that applies for all defense attorneys in criminal cases: *Strickland*.

¶ 160 We acknowledge that our conclusion prevents defendant's additional presentation of his claims in the trial court, but defendant is not without recourse. He does not forfeit ineffectiveness claims that were not presented at the *Krankel* hearing. *People v. Teen*, 2023 IL App (5th) 190456, ¶ 66. "Accordingly, he may assert such claims on direct appeal or through the Post-Conviction Hearing Act (725 ILCS 5/122-1 *et seq.* (West 2022))." *Id.*

¶ 161 Having concluded that *Krankel* counsel's decision not to present all of a defendant's nonfrivolous claims, on its own, does not constitute ineffective assistance of counsel, we next examine *Krankel* counsel's and Morris's representation under the usual *Strickland* standard—namely, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496 (2010).

¶ 162 Because we conclude that *Krankel* counsel's failure to raise defendant's specific claims for ineffective assistance did not prejudice defendant, we discuss only that prong. See *Veach*, 2017 IL 120649, ¶ 30 ("A defendant must satisfy both prongs of the *Strickland* test and a failure to satisfy any one of the prongs precludes a finding of ineffectiveness." (Internal quotation marks omitted.)).

¶ 163    c. Defendant Was Not Prejudiced by Morris's Allegedly Deficient Representation

¶ 164    Defendant makes three claims for ineffective assistance of counsel—namely, Morris's failure to adequately present arguments and evidence regarding (1) the unreasonable extension of the traffic stop, (2) problems with the free-air dog sniff, and (3) the denial of his alleged right to testify at the suppression hearing. We address each issue in turn.

¶ 165    i. *The Duration of the Traffic Stop*

¶ 166    Defendant argues that had Morris argued that the traffic stop was unlawfully prolonged in order for police officers to conduct an open-air dog sniff of defendant's car, a reasonable probability exists that he would have succeeded on his motion to suppress. The core of his argument is that Heffner-Dewitt engaged in small talk with defendant before reaching "arguably needed" questions, like "the model year of [defendant's] SUV." However, defendant does not come close to persuading us that an officer's making small talk while working on a citation constitutes prolonging the traffic stop. Indeed, the trial court found that there was no evidence showing the conversation between Heffner-Dewitt during traffic stop was anything other than "casual conversation while working on the citation, waiting for calls to come back concerning status of defendant's license, etc."

¶ 167    Further, even if the CAD report showed that Heffner-Dewitt radioed for a dog sniff before conducting the traffic stop, that fact does not show that Heffner-Dewitt acted in any unlawful manner. See *People v. Reedy*, 2015 IL App (3d) 130955, ¶ 31 ("[O]fficers do not need independent reasonable articulable suspicion of drug-related activity in order to perform a dog sniff pursuant to an ordinary traffic stop."). Accordingly, given this record, we conclude no reasonable probability exists that had the issue been argued, the motion to suppress would have been granted.

¶ 168                              ii. *The Canine Sniff*

¶ 169        Defendant next argues that had Morris adequately challenged the canine alert on his car, there was a reasonable probability that the trial court would have granted a motion to suppress on those grounds. We disagree.

¶ 170        Ent testified (1) that he was a trained canine officer, (2) that his canine was trained to detect drugs, (3) to the canine's behaviors upon alerting to the presence of drugs, and (4) that the canine gave a final alert for drugs in accordance with his training and experience with the canine. *Drain*, 2023 IL App (4th) 210355, ¶ 58. The only potential indication in the record supporting a challenge to the dog's credentials is the fact that the canine alerted aggressively when it had most recently been trained to alert passively. However, Ent explained that the canine had been trained to alert both ways and that he understood the aggressive alert to be it responding to and finding the location of drugs in defendant's vehicle.

¶ 171        Further, there is no indication that the State would not have responded to a challenge to the canine's credentials by introducing the canine's certification and training records. Put simply, defendant has not met his burden to show he was prejudiced.

¶ 172              iii. *A Defendant's Right To Testify at a Suppression Hearing*

¶ 173        Defendant argues that he had a right to testify at the suppression hearing and was denied that right when Morris refused to call him as a witness. In support of his argument, he points out that (1) a criminal defendant has the right to take the witness stand and to testify in his or her own defense (*Rock v. Arkansas*, 483 U.S. 44, 49 (1987)) and (2) "the procedural due process constitutionally required in some extrajudicial proceedings includes the right of the affected person to testify" (*id.* at 51 n.9 (citing *Goldberg v. Kelly*, 397 U.S. 254, 269 (1970) (which noted that a defendant had the right to testify in a case involving the possible termination of welfare benefits))).

He contends that "if a person has a constitutional right to testify before his or her welfare benefits are terminated, *** a defendant has an equivalent right to testify on his own behalf during a suppression hearing."

¶ 174    We disagree that Morris's decision not to call defendant to testify and *Krankel* counsel's decision not to argue the substance of this claim constitutes ineffective assistance. No Illinois court has addressed whether a defendant represented by counsel has a right to determine whether he or she testifies at a hearing to suppress evidence obtained from a traffic stop, and we will not be the first. Indeed, the cases defendant cites are far from on point, and the only case the State cites that even comes close to this issue is *People v. Krueger*, 2012 COA 80, a Colorado appellate court decision that held that a defendant did not have the right to testify at a pretrial suppression hearing.

¶ 175    In *Krueger*, the Colorado appellate court explained that (1) "unlike the decision whether to go to trial, the decision whether to move to suppress evidence is a strategic one for counsel to make in the exercise of professional discretion" and (2) "the reasons for allowing a defendant to decide whether he will testify at trial do not apply in the suppression hearing context." *Id.* ¶¶ 24-25. Regarding that second point, the court emphasized that the importance of a defendant's being allowed to testify in his own defense centered on whether "his ultimate guilt or innocence [was] at stake" and most federal courts had concluded that a defendant does not have the right to testify at a pretrial suppression hearing. *Id.* ¶¶ 30-31 (collecting cases).

¶ 176    Although we believe the *Krueger* court's analysis has merit, we need not definitely resolve this issue because defendant does not show how he was prejudiced by not testifying at the hearing on the motion to suppress.

¶ 177                                III. CONCLUSION

¶ 178        For the reasons stated, we affirm the trial court's judgment.

¶ 179        Affirmed.

*People v. Maury*, 2025 IL App (4th) 220887

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Livingston County, No. 18-CF-162; the Hon. Jennifer Hartmann Bauknecht, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Catherine K. Hart, and Ryan R. Wilson, of State Appellate Defender's Office, of Springfield, for appellant. |
| **Attorneys for Appellee:** | Michael Regnier, State's Attorney, of Pontiac (Patrick Delfino, David J. Robinson, and Allison Paige Brooks, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |