NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 240697-U

NOS. 4-24-0697, 4-24-0713 cons.

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
June 26, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | McLean County |
| JAMES M. JAMISON, | ) | Nos. 21CF345 |
| Defendant-Appellant. | ) | 22CF1133 |
| | ) | |
| | ) | Honorable |
| | ) | J. Jason Chambers, |
| | ) | Judge Presiding. |

---

JUSTICE STEIGMANN delivered the judgment of the court.
Justices Lannerd and Knecht concurred in the judgment.

**ORDER**

¶ 1 *Held:* The appellate court affirmed defendant's conviction and consecutive sentences.

¶ 2 In June 2021, in McLean County case No. 21-CF-345, defendant, James M.
Jamison, pleaded guilty to domestic battery, a Class 4 felony (720 ILCS 5/12-3.2(a)(2) (West
2020)) and was sentenced to 30 months' probation for the battery of Leah Bradford, his
girlfriend.

¶ 3 In November 2022, in McLean County case No. 22-CF-1133, defendant was
charged with (1) domestic battery, a Class 4 felony (720 ILCS 5/12-3.2(a)(2) (West 2022)) and
(2) possession of methamphetamine, a Class 3 felony (720 ILCS 646/60(a) (West 2022)). The
charges alleged that on November 6, 2022, defendant "pinned [Bradford] to a couch with his
body," having previously been convicted of domestic battery. In addition, defendant was found

to have possessed less than five grams of a substance containing methamphetamine on his person. Later that month, the State filed a petition to revoke his probation in case No. 21-CF-345.

¶ 4        In February 2024, a jury found defendant guilty of both counts in case No. 22-CF-1133. The trial court also found that the allegations in the petition to revoke had been proven and revoked defendant's probation in case No. 21-CF-345.

¶ 5        In April 2024, the trial court conducted a combined sentencing hearing for both cases and sentenced defendant to a cumulative nine years in prison, consisting of concurrent sentences of six and five years, respectively, for domestic battery and possession of methamphetamine in case No. 22-CF-1133, followed by a consecutive three years for his probation violation in case No. 21-CF-345.

¶ 6        Defendant appeals, arguing that the trial court erred by (1) denying him the right to present an affirmative defense and (2) sentencing him to consecutive prison sentences. We affirm.

¶ 7                              I. BACKGROUND

¶ 8                  A. Defendant's Guilty Plea in Case No. 21-CF-345

¶ 9        In June 2021, the trial court conducted a hearing, at which it accepted defendant's plea of guilty to domestic battery, a Class 4 felony (720 ILCS 5/12-3.2(a)(2) (West 2020)). The State provided the following factual basis for the plea, to which defendant stipulated:

          "If this case were to proceed to trial, the State would provide sufficient

          evidence to show that as of March 18, 2021, the defendant and the victim were in

          a dating relationship and resided together. On March 18th of 2021, the defendant,

          victim and victim's four-year-old daughter by the initials of CB as in boy, were

          eating at Hy-Vee when the defendant started accusing the victim of cheating on

him. Defendant then stood up, walked over to the victim and grabbed her by the neck with his hands and pushed her down and up against the minor child. He restrained the victim in this way for over 17 seconds. The defendant has a prior conviction for violation of order of protection out of Jackson County, Illinois."

¶ 10        The trial court accepted the factual basis and sentenced defendant to 30 months' probation.

¶ 11                          B. The Charges in Case No. 22-CF-1133

¶ 12        In November 2022, defendant was arrested and charged with (1) domestic battery, a Class 4 felony (720 ILCS 5/12-3.2(a)(2) (West 2022)) and (2) possession of methamphetamine, a Class 3 felony (720 ILCS 646/60(a) (West 2022)). The charges alleged that on November 6, 2022, defendant "pinned [Bradford,] to a couch with his body," having previously been convicted of domestic battery. In addition, defendant was found to have possessed less than five grams of a substance containing methamphetamine on his person.

¶ 13                          C. Pretrial Matters

¶ 14                          1. *The Petition To Revoke Probation*

¶ 15        In November 2022, the State filed a petition to revoke defendant's probation in case No. 21-CF-345, alleging that defendant had violated the terms of his probation by committing domestic battery and unlawful possession of methamphetamine, as alleged in case No. 22-CF-1133.

¶ 16                          2. *Defendant's Request To Proceed Pro Se*

¶ 17        In April 2023, the trial court conducted a status hearing on defendant's case at which defendant was present with counsel. Defendant indicated that he wished to represent himself. The trial court then explained the charges and possible penalties to defendant. The court

asked, "Understanding the charges and possible penalties, is it still your desire to give up your right to a lawyer and represent yourself?" Defendant replied, "Yes, it is."

¶ 18     The following colloquy occurred between defendant and the trial court:

"THE COURT: Your right to have a lawyer represent you is guaranteed by law, and no one can take that away from you without your approval and consent. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: You have the right to choose *** and hire your own lawyer at your own expense. If you do not have money to hire a lawyer, the Court will appoint a lawyer for you, and he or she will represent you without any cost to you. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: If you have a lawyer he or she would advise you about such things as what plea to enter, whether you should have a trial by a jury or a bench trial, whether you should present witnesses in your defense. The lawyer would work with you in preparation of your defense, and would be able to cross-examine witnesses who may testify against you. The lawyer would argue your position to the judge or jury, *** and would look for and present the laws that might apply to your case. The lawyer could research, file, and present appropriate motions to the Court. The lawyer would be able to conduct investigation in your case, would be able to go out and interview the State's witnesses, and locate and interview witnesses that may be helpful to your case. A lawyer can help you by determining whether there are possible defenses to the

charges against you by consulting with the prosecutor about possible reduced charges or lesser penalties. And if you're convicted, a lawyer could present to the Court matters which might lead to a lesser sentence.

Do you understand that these are just some of the things that a lawyer would do for you?

THE DEFENDANT: Yes, sir.

THE COURT: If you choose to give up your right to a lawyer and represent yourself, you would be responsible for all of those things. There are a few things that would be wise for you to think about before you give up your right to a lawyer. First, presenting a defense in court is not a simple matter of just telling your story. It requires an understanding and an adherence to technical rules governing the conduct of a trial, including how to get evidence admitted during the trial.

Secondly, a lawyer has substantial experience and training in trial procedure in order to understand these things, and you must remember the State will be represented by an experienced attorney against you. Someone who is unfamiliar with legal procedures may allow the prosecutor an advantage by failing to make objections to inadmissible evidence, or may not make effective use of such rights as *voir dire* of potential jurors, and may make tactical decisions that wind up producing unintended consequences that actually hurt your defense.

Additionally, if you proceed *pro se*, then you will not be allowed to complain later on on appeal about the competency of your representation. The effectiveness of your defense may well be diminished by your dual role of

attorney and accused. If you choose to represent yourself, you must understand that you will not receive any special consideration from the Court. In other words, you will be required to follow the same rules that an attorney is expected to know and follow, and you will not receive any extra time for preparation, or any greater time in the law library than anyone else just because you're representing yourself. Do you understand that?

THE DEFENDANT: Yes, sir.

THE COURT: If the Court allows you to represent yourself *** , you will not be given an opportunity to change your mind later in the middle of a trial. Do you understand that?

THE DEFENDANT: Yes, sir.

* * *

THE COURT: And what level of education have you had?

THE DEFENDANT: College.

* * *

THE COURT: And have you ever represented yourself in court before?

THE DEFENDANT: Yes, sir.

* * *

THE DEFENDANT: It was in Southern Illinois, hostage case.

* * *

THE COURT: Okay. Do you have any questions about the things that we just talked about?

THE DEFENDANT: Do I have to put in another FOIA for the rest of

discovery?

THE COURT: I can't—

THE DEFENDANT: My question—

THE COURT: I can't tell you in terms of what you need to do, but I'm asking you, do you have any questions about the things I've just gone over with you?

THE DEFENDANT: Okay. So my question is, how do I go about getting discovery?

THE COURT: That's what I've kind of been going over with you here, telling you, if you represent yourself, you're expected to know that and figure that out, because I can't tell you how to do it.

THE DEFENDANT: Understood.

THE COURT: My answer to that is, I can't tell you how to do that.

THE DEFENDANT: Sure.

THE COURT: Do you have any other questions about what I have gone over with you?

THE DEFENDANT: No, sir.

THE COURT: Is anyone forcing, threatening, or coercing you in any way to make you give up your right to an attorney?

THE DEFENDANT: No, sir.

THE COURT: Understanding everything I've said here in regards to that, do you still wish to give up your right to have a lawyer represent you in each of these cases?

THE DEFENDANT: Yes, sir.

THE COURT: All right. [counsel for the State], any other questions you would rather have me ask him?

[THE PROSECUTOR]: Not regarding the *pro se* admonishment, no.

THE COURT: Okay. I'm going to make a finding that the waiver is knowing, and intelligent, and voluntary. And I will allow him to proceed *pro se* based on the information, his answers here today, and I'll allow [defense counsel] to withdraw from the case."

¶ 19                                3. *Defendant's Motions*

¶ 20        In June 2023, defendant *pro se* filed a "Motion to dismiss Domestic Battery Subsequent felony," asking the trial court to "make an [*sic*] pre-trial determination that, Domestic-Battery should not admitted [*sic*] and should be Excluded due to thee [*sic*] spoliation of Evidence." Defendant alleged, among other things, that Bradford had admitted that she punched him "several times." He also attached an annotated copy of an order of protection petition that Bradford had filed, pointing out various alleged inconsistencies, questions, and concerns he had regarding the allegations in the petition and alleged falsehoods.

¶ 21        In November 2023, defendant *pro se* filed a motion asking for the State to "supply the defendant with an offer of proof in regaurds [*sic*] to the alleged victims [*sic*], Leah Bradford," and if "the State does not show proof or evidence of charged crime then" the charges against him should be dismissed. The motion alleged, among other things, (1) on November 6, 2022, Bradford gave false statements to the police and coerced her child to give false statements to the police, (2) "the defendant has information and has expressed legitimate concerns about the traumatizing effect that the alleged victim [(Bradford)] has cause[d] defendant by hitting him,"

(3) Bradford admitted to "hitting the defendant over ten times, *** proof of this is on the defendant's hoodie," and (4) Bradford "had no right to put her hands on the defendant without his permission."

¶ 22        Ultimately, the trial court denied these motions.

¶ 23        D. The Combined Jury Trial and Hearing on the Petition To Revoke

¶ 24        In February 2024, the trial court conducted defendant's jury trial, at which the court also considered the State's petition to revoke defendant's probation. Defendant represented himself both for the jury trial and the hearing on the petition to revoke.

¶ 25        We note that the transcript shows that throughout the trial, the trial court sustained numerous objections by the State and conducted numerous sidebars to address defendant's improper questioning of witnesses, which included, among other things, asking repeated irrelevant questions, eliciting inadmissible hearsay, and making assertions without asking a question of the witness. Outside the presence of the jury, the court addressed defendant's misunderstandings of the law and explained to defendant why various objections were being sustained. In addition, while asking questions of the witnesses and speaking with the court, defendant frequently interrupted the speaker, and the court admonished him many times that only one person could speak at a time.

¶ 26        1. *The State's Case in Chief*

¶ 27        a. Bradford

¶ 28        Bradford testified that she lived with defendant at 406 Catherine Street in Bloomington, Illinois, with her daughter, who had recently turned seven years old. On the morning of November 6, 2022, she returned home after spending the prior night at her sister's house. She spent the morning "going around town trying to get insulin from the different

Walgreens." Before going home, she called defendant, who was her live-in boyfriend, and his speech gave her the impression that he was intoxicated. As soon as Bradford got home, around 10 a.m., defendant began yelling at her and followed her around the house. He was upset because he did not believe that she had really spent the morning going to different Walgreens locations, accusing her of lying.

¶ 29    Eventually, defendant followed Braford into the living room and pushed her onto the couch. He got on top of her and straddled her waist with his legs. She tried to push him off, and he said, "If you flinch, I will beat your ass." At that point, she stopped fighting to get him off her. Bradford called out to her five-year-old daughter, who came into the room. Defendant told her daughter to go back to her room. Bradford told her to leave, and her daughter went across the street to a neighbor's house.

¶ 30    After Bradford's daughter left, defendant continued to yell at Bradford, bucking his head so that he almost head-butted her. He screamed, "Quit F-ing playing with me, Leah. I will kill you. I will kill you. This is what you wanted. This is what you wanted."

¶ 31    Bradford's daughter came back into the house, along with three children who lived nearby. Defendant told them he was not doing anything wrong and held his hands up to "make it looks [*sic*] like he wasn't hurting [her] or anything." The children stood there watching, and Bradford told them to get help. At that point, defendant got off of her, and she left the house.

¶ 32    Bradford and her daughter waited down the street by Bradford's car for police officers to arrive; defendant sat on the porch of the house. After the officers arrived, around five to eight minutes later, Bradford told the officers what happened and showed them her two fingernails, which were bleeding and broken.

¶ 33    On cross-examination, defendant asked Bradford numerous questions regarding

what had occurred on the day of the offense, including (1) what Bradford had been doing that morning before returning home, (2) where in the house the argument between Bradford and defendant occurred, (3) specifics about how defendant ended up on top of her on the couch, and (4) why her fingers were bleeding. Bradford generally answered defendant's questions consistent with her previous testimony.

¶ 34    Regarding the argument and defendant's restraining Bradford on the couch, she testified, "I just know I walked in and the argument started. You followed me all the way through the house to the back of the house, back to the front of the house and to the kitchen." She continued, "I walked through the front door, you followed me down the hallway to the back, up through the hallway, past the front room into the kitchen, and then you followed me back into the living room." Then, coming from the kitchen to the living room, defendant pushed her down on the couch. She stated that she never hit defendant and her fingernails broke because she had tried to get defendant off of her.

¶ 35    While cross-examining Bradford, defendant became argumentative multiple times, and the trial court admonished him of what he could not do or ask when examining a witness. At one point, the court admonished defendant that his cross-examination had taken twice as much time as the State's direct examination, and if he continued to waste time "repeating things, asking questions repeatedly, having her go over the same testimony repeatedly, then [the court] might just say this cross-examination is done."

¶ 36    b. Officers David Ziemer and Jeffrey Widmer

¶ 37    Officers David Ziemer and Jeffrey Widmer testified that they were police officers with the City of Bloomington. On November 6, 2022, they responded to a reported domestic dispute at 406 Catherine Street. Bradford's daughter had called and reported that her mother was

- 11 -

being prevented from leaving by her boyfriend. Ziemer arrived at the house first and parked his squad car about a house and a half away from Bradford's residence. When he got out of the car, Bradford approached him, hysterical and "bleeding from her middle finger." She was crying, and it appeared she had lost a fingernail.

¶ 38        While Ziemer spoke with Bradford, defendant approached from the front porch of 406 Catherine Street. Despite Ziemer's warnings to stop, defendant continued walking towards Ziemer. When defendant reached Ziemer, Ziemer handcuffed defendant, read him his rights, and left him with another officer while he went to speak with Bradford and her daughter. Ziemer then returned to speak with defendant and asked him what happened, but defendant did not want to give a statement.

¶ 39        Widmer arrived at the house after Ziemer had detained defendant. Widmer testified, "[T]he victim and her mother came over towards my direction, and she was very upset, crying, and I just kind of let her and her mom stand there and talk." After conversing with Bradford, Widmer discussed Bradford's statements with Ziemer. Widmer testified, "I explained to him what she had said. He explained to me that the situation after talking with [defendant], and at that point, we placed him into custody."

¶ 40        Ziemer searched defendant and found in his sweater pocket "a little small plastic case" containing two pills. Ziemer also found "in his right jeans pocket *** a little plastic baggie of like greenish tablets." Widmer's field test of the green tablets gave a positive result for methamphetamine. At the jail, Widmer heard defendant say that the substances were "sex pills." (The State later introduced testimony from the forensic testing expert who tested the substance found in defendant's jean pocket that confirmed it contained methamphetamine.)

¶ 41        On cross-examination, Ziemer stated that Bradford told him that when she got

home, defendant began to argue with her. The argument then continued into the living room, where defendant ended up on top of her on the couch and "would not let her leave or [defendant] would punch her in the face." Bradford also told Ziemer that defendant "said [to her] 'I am the devil. You have seen the worst of me now. I will beat your fucking ass. I will kill you.' "

¶ 42　　　　On cross-examination, defendant asked Widmer what he had been told about what, if anything, occurred outside the house, Widmer testified, "I know the only thing that happened outside the house was the daughter ran outside the house to go get help with the neighbor's residence once her mom told her to go for help." Defendant asked Widmer whether Bradford had told him that she had been violent towards defendant. Widmer answered that Bradford told him that she had hit defendant several times because "she was afraid that you were going to hurt her, and she said she stopped hitting you because she said she thought you were going to kill her." Widmer testified:

> "[Bradford] said that you were sitting on top of her threatening her, telling her
> you were going to hurt her, and she tried to hit you because she was afraid of what
> you were going to do and that you might kill her, and that's when she stopped
> because she was afraid of that."

¶ 43　　　　　　　　2. *Defendant's Request To Recall Bradford*

¶ 44　　　　After the jury was dismissed for the day and the State announced it was prepared to rest its case, defendant told the trial court that he wanted to recall Bradford during his case in chief. The State asked that defendant make an offer of proof because defendant had already been given ample time to question Bradford and had spent much of that time repeating the same questions.

¶ 45　　　　The trial court asked defendant what evidence he would attempt to elicit from

Bradford that would not be cumulative to what had already been asked. Defendant stated that he would ask her what occurred in the kitchen on the date of the offense, but he did not know what that would be. He also would question Bradford's daughter about the incident. Defendant explained, "[Bradford] stated that the child she is referencing, and grabbed the child and left the house, and I think that's incorrect." Defendant wanted to question Bradford about "[t]he kitchen, the child, and the contradictions that she gave on the stand." He claimed that he was not able to question Bradford adequately about the "hitting" and the "kitchen incident." The court briefly stated that it would allow defendant to recall Bradford but told him not to waste time or elicit cumulative testimony.

¶ 46        After a recess, the trial court elaborated its decision regarding defendant's recalling Bradford as follows:

"Before we continue, I guess I'll mention also just to explain my ruling a little bit more here. *** [E]ffectively I'm being asked [(by the State)] to bar a witness from testifying, which is the most extreme thing that I can do, I think, in regards to a witness, and I think I have to have, I don't know if overwhelming is the right word, but a pretty compelling reason to do that rather than if there is some alternative that I am supposed to consider that alternative first. And I'm going with that alternative first.

If there was a circumstance of the reverse of a defense saying the State has already put in substantial evidence, they shouldn't get to put in more evidence, I would be hard-pressed to find a reason to limit—to say you've already put in enough, I'm not going to let you put in more. So that's why I'm allowing it.

I don't want to have to have a situation where, based on doing the most

extreme thing that I can regarding a witness where we would have to do this again."

¶ 47 After introducing evidence of defendant's prior conviction for domestic battery in McLean County case No. 21-CF-345, the State rested. Defendant asked the trial court to dismiss the charges against him, which the court interpreted as a motion for directed verdict. The court denied defendant's motion.

¶ 48 3. *Defendant's Case in Chief*

¶ 49 a. Bradford

¶ 50 Defendant recalled Bradford to the stand and questioned her about whether, on the day of the offense, she told him her child had been "severely burned." Bradford denied making that statement. When asked if her child had a severe burn mark on her chest, Bradford responded, "No, she does not." Defendant then asked whether an examination would reveal a burn mark. Bradford admitted the child had a mark but claimed "this has nothing to do with what happened on November 6."

¶ 51 Defendant attempted to continue questioning Bradford about the child's injury, but the trial court sustained the State's objections on relevance grounds. After two more questions and a second sidebar, the State requested a recess.

¶ 52 During that recess, the State argued that the line of questioning was irrelevant and "completely improper." Defendant stated that he was trying to elicit information about the injury to the child. (We note that as the trial court spoke with the parties, defendant interrupted the court multiple times. The court cautioned defendant about interrupting and explained to him that if he continued to interrupt, the court could find him in criminal contempt of court, which could include jail time that would be consecutive to any other sentence he would be serving.)

¶ 53    The trial court explained that defendant had not laid a foundation for the testimony about injury to Bradford's child. The State argued that the testimony was not relevant and could only be relevant if defendant was raising an affirmative defense, which defendant had provided no notice of. The following exchange between the court and defendant followed:

"THE COURT: Okay. I believe that is a proper argument to make. [Defendant]?

THE DEFENDANT: I did give notice to the police officer on the day in question. They did not put it in their report.

THE COURT: How does the State have notice of that?

THE DEFENDANT: They have a copy of the police report.

THE COURT: But there's no notice of an affirmative defense filed in this file; correct?

THE DEFENDANT: I'm sorry, I'm not understanding what you're trying to say.

THE COURT: We're going to take five minutes. I'm going to review the docket just to make sure that's not there. There have been a lot of filings, but it's not going to take me long to do it because I am not unfamiliar with this case.

***

THE DEFENDANT: So how do I explain what happened to the child and what happened on the day?

THE COURT: *** [T]here are things that each side is entitled to notice of it, and whether or not there is going to be an affirmative defense raised, then that would include defense of self or defense of others. It would be something that you

- 16 -

have to give notice to the State on. And raising it now during your case-in-chief is not timely. So we're going to take five minutes while I do that."

¶ 54    After returning from a brief recess, the trial court explained its ruling on the State's objection to defendant's eliciting testimony about defense of the child as follows:

"I have reviewed the 22-CF-1133 case. *** I don't see any filings that were made where there was discovery compliance with notice of an affirmative defense.

Also, the Court has heard numerous *pro se* motions in this case where there have been pleadings regarding the case. I do not have any recollection from going through those and hearing those motions where there could be something that could be construed as notice having been brought up of this being an affirmative defense that was going to be presented in this case.

I mentioned earlier that barring something is an extreme version of an option for me to do. I'm also considering the timing that we're at in this. The State has rested. We're talking about an affirmative defense that might relate to injuries to a child. There very well could be experts or additional investigation. There could have been—this is just speculation as to it from the Court's standpoint of what other things that could have come into play, had there been an affirmative defense filed.

There could be medical records. There could be DCFS records. There could be lots of steps that someone would have taken, had there been notice provided of that. There wasn't notice provided of that. To now try to raise it after the State has rested and while the witness is being called on the stand, I think, is

- 17 -

very untimely, and I am going to bar that evidence.

You can continue your direct examination of Ms. Bradford, but as to raising a defense of defense of another, I am going to bar that at this time."

¶ 55 Defendant resumed his examination of Bradford, asking similar questions to those she had already answered during the State's case.

¶ 56 Defendant intended to call additional witness, including Widmer and Bradford's child, but none of them were present in court because, other than sending the initial subpoenas, defendant had not followed up with the witnesses about the trial dates.

¶ 57 b. Defendant

¶ 58 Defendant testified on his own behalf. He stated that on November 5, 2022, the day before the incident, he was at home with Bradford and her daughter, watching television and discussing their plans for the next day. They discussed her family coming into town and that he was up for a promotion at his job at Rivian. They planned to go shopping the next day and play slots before she met up with her family and he went to work.

¶ 59 Defendant worked the overnight shift that night. About an hour before his shift ended in the morning, he called Bradford to see if they were still "good to go" on their plans for the day. She told him that she needed to get her medication. He told her that his shift was nearly over and to be ready to go. They did not argue. They spoke again on the phone, and Bradford again said she had not been able to get her medication, which caused him concern.

¶ 60 Defendant remembered that they had emergency medication for Bradford in the car and called her to remind her. She asked which medications they were, which he found "unusual." He did not understand why, if it was an emergency, she was being hesitant. He asked her which Walgreens she was at so he could meet her, but she said she would just meet him at

the house. When defendant arrived at the house, Bradford was already there because her car was parked outside. He grabbed Bradford's pills from the emergency spot out of the car and entered through the unlocked front door. When defendant walked into the house, he saw Bradford disciplining her daughter.

¶ 61　　　　The State objected, stating that the testimony was not relevant and defendant was "trying to get into a defense of others claim again." During a sidebar, the trial court told defendant that the ruling regarding the defense of others claim was not limited to Bradford's testimony and that defendant was barred from eliciting all testimony about that issue. The court stated, "This was all stuff you have raised well in advance and given People notice of. You could have given notice of. You didn't. You're bringing it up now for the first time, and it is too late for you to do that." Defendant asked for a continuance to rewrite his testimony to avoid discussing the barred information, and the judge agreed to send the jury out for an extended lunch break. He then asked the court, "You said it's called affirmative what?" The court stated, "Affirmative defense." The court then sent the jury on a break.

¶ 62　　　　Defendant asked if, during the break, "I can come up with an affirmation of defense of the child," would the trial court accept it? The court said that it would allow him to make the argument, but the court needed to know "the compelling reason that you have for having this affirmative defense that you want to present and why the case is 15 months old and you are mentioning defense of others or defense of self" now, when it was not previously mentioned. The court continued as follows:

> "I would need to know why it is being raised at this point, because it
> would be highly prejudicial to the State having a fair trial. They have to comply
> with discovery and give you things, and then you give them nothing, and on day

of trial after they've already rested, you get to do it.

I'm not saying I wouldn't grant it, I wouldn't allow it, but it's not just a simple matter of you saying well, now, I'm giving them notice. Do you understand that?"

¶ 63　The trial court asked the State if there was anything in the police reports that gave the State notice of defense of others or self-defense. The State responded that this was the first it had heard of injuries to the child and, "as to self-defense, the defendant claimed that nothing happened, and so, no, there was no indication of that in the police report."

¶ 64　Defendant told the trial court what his testimony would be and asked if it complied with the court's ruling, stating that he would testify that he "rushed through the door closing it behind me moving towards [Bradford] and the child," asking her to stop and calm down. Bradford then released her daughter, who ran to her room. Bradford then said to defendant, "You won't believe what this girl did, [defendant]. I'm so mad at her."

¶ 65　The trial court stopped defendant, saying, "[Y]ou cannot go into at all any altercation before the charged incident" involving Bradford and the child.

¶ 66　Defendant resumed his testimony, stating that Bradford tried to move past him from the kitchen, "became enraged and started hitting me over and—." At that point, the State objected, the trial court sustained the objection, and defendant stated, "This is about me." The court instructed the jury that they were not to consider the last part of defendant's testimony and sent the jury out again.

¶ 67　The trial court told defendant that he had "ample opportunities to disclose this to the State. You didn't." Defendant stated that he did tell the State through his motions that Bradford hit him several times, including in his motions to dismiss. The court looked through the

file and told the State that in a motion *in limine* for an offer of proof, filed on November 3, 2023, defendant did not give an affirmative defense, but noted that the language there "might be what it is he's referring to." The State said that in the motion, defendant alleged that Bradford admitted to hitting him over 10 times, but that given the context of the motion that allegation was not "tantamount to a notice filing of an affirmative defense."

¶ 68     The trial court also located a *pro se* motion to dismiss the domestic battery charges, filed on June 22, 2023, in which defendant alleged that Bradford, "by [her] own admission, she did punch me several times." The State argued that was also not a proper notice of an affirmative defense. Defendant argued that he was not going to use that evidence to argue self-defense but only to explain what had occurred on the date of the offense. The court told defendant that "this isn't a situation where you get to just magically not call it self-defense and, therefore, you can get it in." The court stated that the mention of Bradford hitting him in the motions does not give a time frame or state that it was right before the charged incident. The court added that if this had been raised prior to the State's presenting its case, then maybe it could have been presented, but now it was too late, and the court was barring the evidence. The court reiterated that the motions were not "proper notice to the State of you planning on using an affirmative defense of self-defense."

¶ 69     At that point, defendant said that he did not want the evidence to support a self-defense claim, but only to tell the jury that Bradford hit him in order to bring up the blood on his sweater. He did not do anything to her. The State argued that defendant was "well-aware" of what he was doing and was "trying to act as if he's not understanding or comprehending" but wanted to "dirty up" Bradford and "plant the seed of self-defense in the jurors' minds." The State agreed to have the court give the jury a limiting instruction that any testimony regarding

Bradford making physical contact with defendant was "not to be considered for any purpose other than [defendant's] assertion of how blood may have gotten on his sweatshirt."

¶ 70        Defendant went on to testify that he sat on the porch while waiting for police. Bradford was not crying outdoors until the police showed up. Defendant testified that as he approached Bradford and Officer Ziemer, he did not hear the officer telling him to stop. The officer searched him before putting him in the car and did not find any pills in his pocket. When the officer searched him again later, looking for Bradford's house key, "these pills was [*sic*] planted on me."

¶ 71        On cross-examination, defendant testified that he did not know what the green pills were that the officer said he found in defendant's pants pocket. Defendant thought maybe it was Bradford's medication. When he told the officer the pills in his pocket were "sex pills," he was being comical.

¶ 72                    4. *The Verdict and Trial Court's Findings*

¶ 73        Ultimately, the jury found defendant guilty of both counts. Following the verdict, the trial court took judicial notice of the facts presented in the court file relevant to defendant's probation in case No. 21-CF-345. The court found that the trial evidence proved the allegations in the State's petition to revoke probation.

¶ 74                        E. The Sentencing Hearing

¶ 75        In April 2024, the trial court conducted a sentencing hearing for both cases. In case No. 22-CF-1133, the court sentenced defendant to six years for domestic battery and a concurrent five years for possession of methamphetamine. In case No. 21-CF-234, the court resentenced defendant to three years in prison, to be served consecutive to the sentence imposed in case No. 22-CF-1133. Defendant did not object to the imposition of consecutive sentences at

the hearing or in a posttrial motion.

¶ 76 Defendant filed a notice of appeal in both cases, and we have consolidated the cases for appeal on our own motion.

¶ 77 II. ANALYSIS

¶ 78 Defendant appeals, arguing that the trial court erred by (1) denying him the right to present an affirmative defense and (2) sentencing him to consecutive prison sentences. We affirm.

¶ 79 A. The Trial Court Did Not Err by Barring Undisclosed Affirmative Defenses

¶ 80 Defendant argues that the trial court should have allowed him to present evidence regarding Bradford's violence against him to establish the defenses of self-defense or defense of others. He concedes that he did not raise the defenses "in a formal document labeled 'affirmative defense,' " but contends that the State had been given notice of his intent to present that evidence in (1) a motion to dismiss the domestic battery charge and (2) a motion *in limine* for an offer of proof. He further contends that "even if the [court's] finding of a discovery violation was correct, [it] should have imposed a less harsh sanction than completely forbidding the presentation of any evidence to support the defense." We disagree.

¶ 81 1. *The Applicable Law and Standard of Review*

¶ 82 Illinois Supreme Court rules require a defendant to disclose to the State any defenses that he intends to present at trial. Specifically, Illinois Supreme Court Rule 413(d) (eff. July 1, 1982) provides, "Subject to constitutional limitations and within a reasonable time after the filing of a written motion by the State, defense counsel shall inform the State of any defenses which he intends to make at a hearing or trial."

¶ 83 The rules also provide the trial court with the authority to impose sanctions

against a defendant who fails to disclose his affirmative defenses. Specifically, Illinois Supreme Court Rule 415(g)(i) (eff. Oct. 23, 2020) provides as follows:

> "If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with an applicable discovery rule or an order issued pursuant thereto, the court may order such party to permit the discovery of material and information not previously disclosed, grant a continuance, exclude such evidence, or enter such other order as it deems just under the circumstances."

¶ 84    Because the facts giving rise to the alleged discovery violation are not in dispute, the threshold question of whether the defense committed a discovery violation is a question of law we review *de novo*. *People v. Ramsey*, 239 Ill. 2d 342, 424 (2010) (citing *People v. Hood*, 213 Ill. 2d 244, 256 (2004)). We review a trial court's imposition of a discovery sanction under the abuse of discretion standard. *Id.* at 429. "An abuse of discretion exists only where the trial court's decision is arbitrary, fanciful, or unreasonable, such that no reasonable person would take the view adopted by the trial court." *Id.*

¶ 85                                    2. *This Case*

¶ 86    At the outset of the case, the trial court ordered defendant to tender all discovery required by Rule 413, which includes disclosure of defenses intended to be made at trial. See Ill. S. Ct. R. 413(d) (eff. July 1, 1982). Defendant claims that he complied with Rule 413 by alleging in two pretrial motions that Bradford punched him "several times" and admitted "to hitting the defendant over ten times." He argues that these claims made the State aware of his intent to present evidence regarding Bradford's violence toward him prior to trial, albeit not in a formal document labeled "affirmative defense." However, these allegations, tucked within motions

*in limine* and to dismiss, do not come close to providing the State with notice that defendant intended to pursue self-defense or defense of others affirmative defenses.

¶ 87    Section 7-1(a) of the Criminal Code of 2012 provides, "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force." 720 ILCS 5/7-1(a) (West 2022)). Neither of defendant's motions contained any language or allegations communicating that his conduct met this definition or that he believed his conduct amounted to such a defense. Accordingly, we conclude that defendant did commit a discovery violation by failing to disclose the affirmative defenses he wanted to pursue.

¶ 88    Having so concluded, we next address the trial court's ultimate decision to bar defendant from pursuing that defense.

¶ 89    Defendant argues that even if we conclude that he did not disclose the affirmative defenses before trial, the trial court's sanction was too harsh, citing *People v. Tally*, 2014 IL App (5th) 120349, ¶ 29, which provides the following factors for the trial court to weigh when considering the exclusion of evidence as a discovery sanction:

> "(1) the effectiveness of a less severe sanction, (2) the materiality of the witness's proposed testimony to the outcome of the case, (3) the prejudice to the other party caused by the testimony, and (4) evidence of bad faith in the violation of discovery rules."

¶ 90    We note that, regarding the fourth factor—whether defendant acted in bad faith— defendant asserts that his failure to follow discovery procedures can, in part, be attributed to his proceeding *pro se*. Defendant argues the following:

> "It is unlikely that there was bad faith in [defendant's] actions that resulted

in the finding of a discovery violation. [Defendant] was acting as his own attorney and was not represented by counsel, except for a brief period of time nearly a year before trial. *** He filed numerous pre-trial motions and his comments in court showed that he, in good faith, believed that his assertions in those motions regarding Bradford's physical actions toward him were sufficient to allow him to bring up that evidence at trial. *** Given that he made frequent reference to the fact that Bradford hit him in his pre-trial filings, there is no showing that [defendant] was trying to hide this position from the State."

¶ 91　　　　We begin our discussion of the trial court's discovery sanction with this portion of defendant's argument because underlying the entirety of defendant's arguments on appeal is the notion that defendant's decision to proceed *pro se*—and thus forgo the constitutionally guaranteed advice and assistance of trained defense counsel—entitles him to not only leniency in all aspects of his self-representation but to flout the rules of evidence and criminal procedure. Defendant implies that because he chose to proceed *pro se*, this court and the trial court ought to view his errors with sympathy and give him special treatment. We emphatically reject this contention.

¶ 92　　　　A criminal defendant's choice to proceed *pro se* is ultimately what he makes of it—he prevails or fails on his own merit; such is the consequence of his decision. Because of the likelihood that a criminal defendant, likely lacking in any formal legal education, will struggle to rise to the occasion and mount a strong—or even adequate—defense against the charges he faces, in *People v. Ward*, 208 Ill. App. 3d at 1081-82 (citing 2 Wayne R. LaFave & Jerold H. Israel, Criminal Procedure § 11.5(a)-(c), at 42-45 (1984)), this court suggested that it would be desirable for a trial court to also warn a defendant of the following concerns:

"(1) presenting a defense is not a simple matter of telling one's story, but requires adherence to various technical rules governing the conduct of a trial;

(2) a lawyer has substantial experience and training in trial procedure and the prosecution will be represented by an experienced attorney;

(3) a person unfamiliar with legal procedures (a) may allow the prosecutor an advantage by failing to make objections to inadmissible evidence, (b) may not make effective usage of such rights as the *voir dire* of jurors, and (c) may make tactical decisions that produce unintended consequences;

(4) the defendant proceeding *pro se* will not be allowed to complain on appeal about the competency of his representation;

(5) the effectiveness of his defense may well be diminished by his dual role as attorney and accused;

(6) defendant will receive no special consideration from the court;

(7) defendant will receive no extra time for preparation or greater library time (if in prison);

(8) a lawyer can render important assistance (a) by determining the existence of possible defenses to the charges against defendant, (b) through consultations with the prosecutor regarding possible reduced charges or lesser penalties, and (c) in the event of a conviction, by presenting to the court matters which might lead to a lesser sentence;

(9) in the event the court accepts defendant's decision to represent himself, defendant will not be given an opportunity to change his mind during trial; and

(10) if the court in its discretion is not going to appoint standby counsel, to

specifically inform the defendant that there will be no standby counsel to assist him at any stage during trial."

¶ 93 Recognizing that "a court's reading of the *Ward* admonitions may dissuade a defendant's unwise decision to waive counsel and represent himself" (*People v. Hood*, 2022 IL App (4th) 200260, ¶ 80 (discussing *Ward* admonitions)), the trial court here gave these admonitions to defendant. Nonetheless, defendant waived his right to counsel.

¶ 94 Having reiterated the stakes of defendant's choosing self-representation—which he stated multiple times he understood—we return now to the issue at hand: Whether the trial court erred by barring defendant from pursuing the affirmative defenses of self-defense and defense of others.

¶ 95 Returning to the fourth factor—evidence of bad faith in violating discovery rules (*Tally*, 2014 IL App (5th) 120349, ¶ 29)—we are not persuaded that defendant's actions were in good faith. Defendant's responses to the trial court when asked directly what evidence he wanted to present and the reasons therefore were elusive and give the impression that he intended to surprise the State with his evidence if only he was able to elicit it. Notably, whenever the parties discussed Bradford's alleged hitting defendant, defendant's arguments focused on his own dangerousness, Bradford's credibility, and how she treated her child. What he did not do was attempt to explain his actions in any way resembling self-defense or defense of others claims. As the State put it, defendant appeared to want to "dirty up" Bradford.

¶ 96 Further, even after being told numerous times that he was not allowed to elicit testimony about Bradford's alleged discipline of her child, he persisted in trying to get that information before the jury. Contrary to his argument about his *pro se*-based lack of professionalism, defendant nonetheless attempted to skirt the trial court's ruling by disclaiming

self-defense at all, claiming that he simply wanted to explain what happened in the kitchen.

¶ 97    Regarding the other three factors—namely, (1) the effectiveness of a less severe sanction, (2) the materiality of the witness's proposed testimony to the outcome of the case, and (3) the prejudice to the other party caused by the testimony (*id.*)—we conclude that no less severe sanction would have been effective, the proposed testimony was not important to the outcome of defendant's case, and the prejudice to the State was immense.

¶ 98    We emphasize, defendant's disclosure, as noted by the trial court, was "very untimely" and came right after the "State ha[d] rested." His disclosure also revealed that he intended to elicit testimony related to the injury of a child, which was intertwined with his assertions that Bradford had hit him. The trial court noted that defendant's claim involved alleged injuries to a child, which could require "experts or additional investigation" if an affirmative defense had been filed. The court also stated, "There could be medical records. There could be DCFS records."

¶ 99    Defendant contends that a continuance would have sufficed to handle the discovery violation because no additional investigation would be necessary by the State and likely the only evidence defendant would present would have been his own testimony, which could have been rebutted by additional testimony from Bradford. However, defendant's assertions are completely speculative and attempt to wrest control of the criminal prosecution from the State.

¶ 100    Defendant could be correct that the State would have required no additional investigation, witnesses, or evidence to rebut defendant's affirmative defenses—a notion that the trial court reasonably rejected—but because defendant failed to disclose his intention to pursue the defenses until after the State had rested its case on the second day of trial, the State was

denied any decision in the matter of how to conduct its prosecution of defendant. Because of defendant's omission, we simply do not know how the State would have presented its case in chief or what other evidence would have been introduced.

¶ 101 Moreover, although it may be possible to imagine ways that Bradford's testimony about hitting defendant or disciplining her child could have been material to the outcome of defendant's case, defendant simply did not connect the dots of her alleged conduct to his conduct in committing the offense. Perhaps, as the trial court noted, her hitting defendant might have been relevant for impeachment purposes, given Widmer's testimony, but beyond that, defendant failed to explain its purpose.

¶ 102 Defendant cites *Tally* (*id.* ¶ 38) and *People v. Houser*, 305 Ill. App. 3d 384, 391-92 (1999), in which the appellate court reversed the trial courts' decisions to bar the presentation of an affirmative defense. However, both these cases are distinguishable from the present case. In *Tally*, 2014 IL App (5th) 120349, ¶ 38, the defendant revealed an affirmative defense before trial began and requested a continuance of the trial. In *Houser*, 305 Ill. App. 3d at 391-92, the defendant disclosed a compulsion defense before trial and disclosed a related defense of necessity on the day that jury selection began. In both these cases, because the disclosure was made before any evidence had been presented, prejudice to the State could have been minimized.

¶ 103 We review discovery sanctions for an abuse of discretion, which means that as long as the trial court's decision is not unreasonable, we will not disturb it on appeal. *Ramsey*, 239 Ill. 2d at 429. For the reasons we have stated, we conclude the court's decision to exclude self-defense and defense of others defenses as a discovery sanction was not unreasonable.

¶ 104 B. Defendant's Consecutive Sentences Were Not Plain Error

- 30 -

¶ 105 Defendant argues that the trial court erred by sentencing him to consecutive sentences because the record did not support the court's finding that consecutive sentences were required to protect the public. We disagree.

¶ 106 As an initial matter, defendant concedes that he forfeited this issue for review both by failing to object when it arose in the trial court and by failing to raise it in a posttrial motion. See *People v. Johnson*, 2024 IL 130191, ¶ 40 (requiring a defendant to object and raise the alleged error in a posttrial motion to avoid forfeiture). Nonetheless, he contends that we may consider his sentencing claim as second-prong plain error. *Id.* ¶ 43. We reject defendant's claim.

¶ 107 1. *The Applicable Law and Standard of Review*

¶ 108 a. Plain Error Generally

¶ 109 The plain error doctrine allows reviewing courts to review a forfeited error if the error falls under one of the following two prongs:

> "(1) when a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) when a clear or obvious error occurred and the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Moon*, 2022 IL 125959, ¶ 20.

¶ 110 The usual first step in a plain error analysis is to determine whether a clear and obvious error occurred. *Johnson*, 2024 IL 130191, ¶ 44. "That is true because if there is no error, then there can be no plain error." *People v. Maury*, 2025 IL App (4th) 220887, ¶ 93. " 'However, similar to the analytical framework we use to review a claim of ineffective assistance of counsel [citation], the first step of plain-error analysis is merely a matter of convention,' and we may

- 31 -

begin the analysis in any order." *Id.* (quoting *People v. Bowens*, 407 Ill. App. 3d 1094, 1108 (2011)).

¶ 111                                    b. Consecutive Sentencing

¶ 112          The trial court is empowered to impose permissive consecutive sentencing terms

"[i]f, having regard to the nature and circumstances of the offense and the history

and character of the defendant, it is the opinion of the court that consecutive

sentences are required to protect the public from further criminal conduct by the

defendant, the basis for which the court shall set forth in the record." 730 ILCS

5/5-8-4(c)(1) (West 2022).

¶ 113          Although consecutive sentences are to be imposed sparingly, the trial court has

wide discretion in determining whether to impose a consecutive sentence, and we will not

interfere with that decision absent an abuse of discretion. *People v. Buckner*, 2013 IL App (2d)

130083, ¶¶ 35-36. The court need not recite specific statutory language when determining that

consecutive sentences are warranted. *People v. Hicks*, 101 Ill. 2d 366, 375 (1984). However, the

record must show the court is "of the opinion that a consecutive term is necessary for the

protection of the public." *Id.*

¶ 114                                    2. *This Case*

¶ 115          Here, defendant's second-prong plain error argument is precisely the sort of

argument that the supreme court rejected in *Johnson*, 2024 IL 130191. In *Johnson*, the court

rejected the defendant's argument that "the [trial] court's error of considering the improper factor

in aggravation is subject to second prong plain error review solely by virtue of the error having

affected defendant's fundamental right to liberty." *Id.* ¶ 86. The court explained its reasoning as

follows:

"[S]tructural errors affect the very framework within which the sentencing hearing proceeds, rather than mere errors in the sentencing process itself. [Citation.] Because a sentencing court is required to weigh all the evidence and factors in aggravation and mitigation to determine a defendant's culpability in imposing the sentence [citation], a structural error at sentencing is an error that renders the sentencing hearing itself an unreliable means of implementing that balance.

Here, the [trial] court's error of considering the improper factor in aggravation does not satisfy that standard because it did not affect the framework within which the sentencing hearing proceeded but was a mere error in the sentencing process itself. [Citation.] Nor did the error undermine the integrity of the judicial process or render the sentencing hearing fundamentally unfair. [Citation.] Nor is the error comparable to the errors deemed structural by the United States Supreme Court. See *Moon*, 2022 IL 125959, ¶ 29 [('The structural errors identified by the Supreme Court include a complete denial of counsel, denial of self-representation at trial, trial before a biased judge, denial of a public trial, racial discrimination in the selection of a grand jury, and a defective reasonable doubt instruction.').]" *Id.* ¶¶ 89-90.

¶ 116 Errors that are reviewable under the second prong of the plain error rule are rare. *Id.* ¶ 53. This alleged error is not one of those rare instances. Defendant's argument that the trial court erred is entirely based on the court's sentencing defendant to consecutive prison terms, which he argues is unjustified based on the record. This argument is essentially no different than the argument the supreme court rejected in *Johnson*—namely, it is a challenge to defendant's

sentence and not the structure or the fairness of the sentencing hearing itself. Like the defendant in *Johnson*, defendant's argument here supports our conclusion that the trial court's sentencing decision was not subject to second-prong plain error review. See *id.* ¶ 94 (stating that the defendant's arguments regarding the closeness of the evidence "illustrate why the sentencing error was not structural error"). Accordingly, defendant's plain error argument fails.

¶ 117                                    III. CONCLUSION

¶ 118          For the reasons stated, we affirm the trial court's judgment.

¶ 119          Affirmed.